[Civ. No. 10317. First Appellate District, Division One.—January 26, 1937.]

In the Matter of the Estate of JOHN THOMPSON, Deceased. MAUDE I. THOMPSON et al., Appellants; A. N. BULLOCK et al., as Trustees, etc., Respondents.

A. W. Brouillet for Appellants.

Rittenhouse & Snyder for Respondents.

KNIGHT, J.—This appeal was taken from the decree of final distribution in the above-entitled estate, and involves the question of the construction of the provisions of the testator's holographic will relating to the disposition of certain portions of the residue of the estate.

The testator, John Thompson, died January 1, 1916, and left surviving him as heirs at law two sisters, Henrietta and Emma Thompson; a half-brother, George Thompson; and numerous nieces and nephews. By his will he directed that his executors use whatever money and property was necessary for the support of his two sisters, "always providing liberally and well for Their needs and comfort", and that upon the death of both sisters "all remaining property, if there be any, to be disposed of as follows. First One Thousand dollars, if there be that amount, and if not then as much as there may be, to be paid to the Trustees of the Odd Fellows Home, of the State of California. Said moneys to be used for building a Summer House, or suitable lounging or Resting place under the Oak Trees, on the Santa Clara Farm where the Home now is located." Then, after bequeathing to his two sisters all personal property not other-

wise disposed of by his will, he gave his "past Masters Jewell" to his nephew, Thornton Thompson; a writing desk to Fred Fillmore; and a "pitcher with Odd Fellow Emblems on it" to a Mrs. Harris. And continuing, the dispositive provisions of the will read: "The Remaining money if any there be, to be distributed as follows. Twenty per cent to my half Brother George Thompson. Ten per cent to my niece Francis. M. Merrill. . . . Ten per cent to my niece Annie Thompson Wife of George A. Thompson  Ten per cent to be divided evenly between my nieces Cora and Mame Thompson. . . . Ten per cent to be divided evenly, between my nieces, Carrie and Emma [Berry]. . . . Ten per cent to be divided evenly between my nephews, Cranch and Vernon Thompson. Ten per cent to my niece Jane Thompson. . . . Ten per cent to . . . Henry Schwerin. Ten per cent to my two Executors Frederick Fillmore and John Hazlett share and share alike if there should be any Residue. *in case of death of any heirs, the Residue to be paid to the Trustees of the Odd Fellows Home.* . . . It is understood that my two Sisters Henrietta and Emma Thompson are to have the full benefit of all my possessions during their life, as before provided, and only after their death, is the estate to be distributed. I have a number of other Relatives, who are not mentioned in this will. To all of whom I am Friendly, and to all of whom I leave my Good Will." (Italics ours.)

One of the decedent's sisters, Emma, died October 6, 1917, and on December 24, 1925, on petition of the surviving sister, Henrietta, the court distributed the $1,000 specific cash legacy provided for in the will to the trustees of the Odd Fellows Home. Henrietta died December 16, 1933, and prior to her death but subsequent to the death of the testator four remaindermen named in the will died. They were George Thompson, the half-brother; Annie Thompson, wife of George A. Thompson; Henry Schwerin, and Frederick Fillmore, the latter being one of the executors. Following the death of Henrietta, the surviving executor proceeded to close the estate, and in his petition for distribution he asked that the shares of the residue to which the deceased remaindermen would have been entitled if they had survived Henrietta, be distributed to the trustees of the Odd Fellows Home pursuant to that clause of the will reading "in case

of death of any heirs, the Residue to be paid to the Trustees of the Odd Fellows Home''. The heirs of George and Annie Thompson filed objections to the petition for distribution, claiming that the shares of the residue bequeathed respectively to the remaindermen vested in them absolutely at the time of the testator's death, subject only to the life estates of Emma and Henrietta Thompson, and that therefore upon the death of George and Annie Thompson their shares of the residue descended to these appellants, and became payable upon the termination of the life estates. The probate court held in effect, however, that in view of the qualifying clause of the will above italicized, it was the intention of the testator to limit the estates of the remaindermen, and that the shares of those who died subsequent to the testator's death and prior to the termination of the life estates, should be paid to the trustees of the Odd Fellows Home. In our opinion the terms of the will amply sustain the construction so placed upon them by the probate court.

As declared by section 101 of the Probate Code (formerly section 1317 of the Civil Code), a will is to be construed according to the intention of the testator. That is, the ascertainment of the testator's intention is the cardinal rule of construction (*Estate of Hartson*, 218 Cal. 536 [24 Pac. (2d) 171]); and when the language used is definite, certain, and unambiguous, such intention is to be ascertained from ''the four corners'' of the will. (*Estate of Metcalfe*, 199 Cal. 716 [251 Pac. 202]; *Estate of Clarke*, 103 Cal. App. 243 [284 Pac. 231]; *Estate of Sowash*, 62 Cal. App. 512 [217 Pac. 123].) In other words, a testamentary instrument is to be examined with a view of discovering the decedent's testamentary scheme or general intention, and the apparent meaning of the particular words, phrases and provisions is to be subordinated to this scheme, plan or dominant purpose and the technical import of the words should not prevail over the obvious intent of the testator. (*Estate of Puett*, 1 Cal. (2d) 131 [33 Pac. (2d) 825]; *Estate of Borba*, 110 Cal. App. 150 [293 Pac. 809].) Moreover, the language used must be liberally construed with a view to carrying into effect what the will as a whole shows was the real intent of the testator (*Estate of Hoytema*, 180 Cal. 430 [181 Pac. 645]); and it should be so interpreted as to render it and every part thereof operative if it be reason-

ably susceptible of such interpretation to the end that the intention of the testator be given effect. (*Estate of Gracey,* 200 Cal. 482 [253 Pac. 921].)

It is evident from a reading of the entire will under consideration that the uppermost thought in the mind of the testator at the time he wrote his will was to provide liberally for the support and well-being of his two surviving sisters during their lives; and that his secondary thought was to provide for the Odd Fellows Home. This secondary thought is clearly demonstrated by the clause of the will which provided that if upon the death of both sisters the entire residue of the estate amounted to no more than $1,000, it should all go to the Odd Fellows Home. Under the authorities above cited, some effect must be given if possible to the qualifying clause that "in case of death of any heirs" the residue should be paid to the Odd Fellows Home. Appellants argue that thereby the testator meant those who might predecease him. But the use of the word "heirs" in the clause tends strongly to show that he meant those whose deaths might occur subsequent to his and prior to the time the residue was ready for distribution. This latter construction is reasonable, and it is further supported by the last clause of the will wherein the testator stated that he had "a number of other Relatives", but that he had made provision for only those he had named in the will.

Appellants have devoted much of their brief to a technical discussion of the meaning of certain legal terms usually employed by the legal profession in drafting wills; also in pointing out the legal distinction between various kinds of remainders recognized in the law of wills; and in this connection it may be stated that where a will has been drawn by one skilled in law, the presence of technical terms has weight in determining the meaning of the will. But it is well established in this state by statute and judicial decision that the words of a will are to be taken in their ordinary and grammatical sense unless a clear intention to use them in another sense can be collected, and that other can be ascertained; and that technical words are not to be taken in their technical sense where it satisfactorily appears that the will was drawn solely by the testator and that he was unacquainted with such technical sense. (Sections 1324, 1327 and 1328 of the Civil Code, now em-

bodied in section 106 of the Probate Code; *Estate of Coleman,* 189 Cal. 612 [209 Pac. 571]; *Estate of Fuller,* 135 Cal. App. 781 [28 Pac. (2d) 399]; *Estate of McCrum,* 97 Cal. App. 576 [275 Pac. 971]; *Estate of O'Gorman,* 161 Cal. 654 [120 Pac. 33]; *Estate of Spencer,* 181 Cal. 514 [185 Pac. 474]; *Estate of Weber,* 76 Cal. App. 723 [245 Pac. 776].) Admittedly, in the present case the testator was a layman, unskilled in the law and unacquainted with technical legal terms. Moreover, it would appear from the manner in which the will was written that he was not well versed in the rules of punctuation, capitalization, or grammatical construction. However, the entire will shows a clear, definite plan and purpose for the disposition of his estate; and we are convinced that the construction placed upon the will by the trial court is fully justified by its terms and is in conformity with the obvious intentions of the testator.

The decree is affirmed.

Tyler, P. J., and Cashin, J., concurred.