[Civ. No. 36790. First Dist., Div. Two. May 3, 1976.]

WELLS FARGO BANK, as Trustee, etc., Plaintiff and Respondent, v.
EDA SHERMAN HUSE et al., Defendants and Appellants;
DIANA SHERMAN PEACOCK et al., Defendants and Respondents.

**COUNSEL**

Kent, Bradley, Burns, Kaplan & Williams, Felix Lauricella and John L. Bradley for Defendants and Appellants.

Jacobs, Blanckenburg, May & Colvin and Robert A. Martin for Defendants and Respondents.

No appearance for Plaintiff and Respondent.

## OPINION

**KANE, J.**—This is an appeal from a declaratory judgment construing certain language in an *inter vivos* trust agreement.

On June 27, 1923, Ida J. Moody (hereinafter "Mrs. Moody" or "trustor") executed a trust agreement whereby she transferred to the trustee 5,000 shares of the capital stock of Moody Estate Company, a corporation. The net income from the trust was to be paid to the trustor for her life. At her death the trust was to be divided into two shares. One-third of the shares was to be held for Mrs. Moody's daughter, Mai deB. Watson ("Mai"), who was to receive the income, dividends and profits deriving therefrom for her life. The remaining two-thirds of the shares were to be held for Mrs. Moody's second daughter, Eda Moody Sherman ("Eda Moody"), who was also made a life income beneficiary under the trust.

Apparently occasioned by the death of Eda Moody, on April 29, 1930, Mrs. Moody amended the original trust agreement. While leaving the provisions pertaining to Mai unchanged, the amended agreement substituted the life beneficiaries with regard to the two-thirds of the trust. The modified trust agreement provided that income interests for life be given to Eda Sherman Huse[1] ("Eda") and Frederick Moody Sherman ("Frederick"), the two surviving children of Eda Moody and the grandchildren of the trustor. Upon the death of either income beneficiary without leaving surviving issue the entire income was to go to the survivor, but if a deceased income beneficiary was survived by "lawful issue," the trust was to terminate as to one-half of the shares and the principal was to be distributed to his or her lawful issue by right of representation.[2]

---

[1]Named in the amendatory agreement as Eda Moody Sherman, Junior.

[2]Due to its crucial importance, we set out verbatim the pertinent portion of the amended trust agreement:

"Upon the death of either of said FREDERICK MOODY SHERMAN or said EDA MOODY SHERMAN, JUNIOR, after the death of the Trustor during the lifetime of the other without leaving lawful issue him or her surviving, the entire net income thereof

Upon Mrs. Moody's death on February 15, 1933, the trust became irrevocable and the net income from Eda Moody's share was paid to her children, Eda and Frederick, in equal shares. Eda married, but had no issue. Frederick also married and, having no offspring of his own, adopted two children: a son, Edward Mills Sherman ("Edward") and a daughter, Diana Sherman Peacock ("Diana"). Edward was adopted in 1940 at the age of one and a half years, Diana was adopted in 1942 when she was about six months old. Edward died on April 14, 1968 leaving two natural children: Edward Morgan Sherman ("Edward Jr.") and Shelly Kathleen Sherman ("Shelly"), both minors. Frederick died on April 20, 1972, survived by Diana, his adopted daughter and by Edward Jr. and Shelly, the surviving children of his adopted son.

■ The dispute at bar revolves around the interpretation of the cited provision of the trust agreement (see *ante,* fn. 2) which became operative on Frederick's death. While appellants (Mrs. Moody's granddaughter, Eda, who would be entitled to a life estate on Frederick's share, and Mrs. Moody's heirs at law, the ultimate remaindermen) contend that the phrase "lawful issue" does not include the adoptive claimants, respondents (Frederick's adopted children[3]) insist that both as a matter of law and public policy adopted children must be placed on the same footing as natural born offspring and thereby qualify as lawful issue within the purview of the 1930 amended trust agreement. The trial court upheld the contention of respondents.

Assailing the judgment below, appellants vigorously argue that the conclusion reached by the trial court is erroneous because (1) pursuant to

shall be paid to the survivor of said FREDERICK MOODY SHERMAN and said EDA MOODY SHERMAN JUNIOR, during the term of the natural life of such survivor; and upon the death of such survivor the trust shall terminate as to said 3,334 shares and the same shall go and belong to the lawful issue of such survivor if any such there be, but if such survivor leave no lawful issue him or her surviving then said 3,334 shares shall go and belong to the heirs-at-law of the Trustor as determined by the Statutes of Succession of California then in force.

"*In the event,* however, *of the death of* FREDERICK MOODY SHERMAN after the death of the Trustor *leaving lawful issue him surviving this trust shall terminate as to one-half of said 3,334 shares,* to-wit, 1667 of said shares, *and said 1667 shares shall go* and belong *to* such *lawful issue of* FREDERICK MOODY SHERMAN *per stirpes* and not per capita." (Italics added.)

[3]For ease of expression, the phrase "adopted children" refers to all the adoptive claimants, that is, it includes Diana, Frederick's adopted daughter, and the children of Edward, Frederick's adopted son. It is undisputed that if the adopted daughter qualifies as lawful issue, the natural children of the predeceased adopted son will also qualify (cf. *Estate of Winchester* (1903) 140 Cal. 468 [74 P. 10]; *Estate of Hebert* (1941) 42 Cal.App.2d 664 [109 P.2d 729]).

the law prevailing at the time of the execution of the trust documents the phrase "lawful issue" referred to natural or blood relationship and did not include an adopted child, and (2) the circumstances surrounding the trust agreement, such as its general scheme and purpose and the dates of adoption, are indicative of an intent by the trustor to preserve the benefits of the trust in the blood line. As shall appear below, neither of appellants' arguments can be accepted, and as a result the judgment of the trial court must be affirmed.

At the outset, we call to mind the general principles governing the construction of wills and related documents. ▆ As has been said many times, the paramount rule in the construction of wills, to which all other rules must yield, is that a will is to be interpreted according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible (Prob. Code, § 101; *Estate of Russell* (1968) 69 Cal.2d 200, 205 [70 Cal.Rptr. 561, 444 P.2d 353]; *Ephraim* v. *Metropolitan Trust Co.* (1946) 28 Cal.2d 824, 834 [172 P.2d 501]). For interpretive purposes, there is no distinction between *inter vivos* and testamentary trusts. As the court put it in *Brock* v. *Hall* (1949) 33 Cal.2d 885, 889 [206 P.2d 360, 11 A.L.R.2d 672]: "the primary duty of the court in construing all documents is to give effect to the intention of the maker, and we can see no justification for any distinction in this regard between instruments operating *inter vivos* and those taking effect at death since the intention to be gathered from similar words or provisions, whether they be contained in a declaration of trust or a will, would ordinarily be the same." (See also: *Estate of Russell, supra; Vincent* v. *Security-First Nat. Bk.* (1945) 67 Cal.App.2d 602 [155 P.2d 63].)

▆ The centerpiece of interpretation, of course, is the language contained in the will or the trust document. One of the axioms is that words are to be taken in their ordinary and grammatical sense, unless a clear intention to the contrary can be ascertained (*Estate of Thompson* (1937) 18 Cal.App.2d 680, 684 [64 P.2d 984]). ▆ Where an instrument has been drawn by one skilled in the law, the presence of legal technical terms is an indication that the legal term of art has been used, and therefore is to be accepted, in accordance with its legal definition (*Estate of Thompson, supra; Maud* v. *Catherwood* (1945) 67 Cal.App.2d 636, 641 [155 P.2d 111]).

▆ While as a general rule the intention of the testator must be determined from the language used in the will, it is well recognized that as an aid of interpretation the courts may consider and examine the

circumstances surrounding the execution of the document in order to ascertain what the parties meant by the words used (Prob. Code, § 105; *Estate of Russell, supra,* at pp. 208-209; see also: *Estate of Fries* (1963) 221 Cal.App.2d 725 [34 Cal.Rptr. 749]; *Estate of Sullivan* (1948) 86 Cal.App.2d 890 [195 P.2d 894]). Significantly enough, the cases emphasize that among the circumstances to be considered are relevant statutes, case law and public policy in effect at the time of the execution of the document which, in the absence of a contrary intent, are deemed to become a part of the testamentary scheme (*Estate of Heard* (1957) 49 Cal.2d 514, 521-522 [319 P.2d 637]; *Estate of Stanford* (1957) 49 Cal.2d 120, 138 [315 P.2d 681]).

It is conceded by all parties that in the case at bench there is little help to be gained from the express language of the trust. Although Mrs. Moody used the term "lawful issue" in both the original and the amended trust indentures, she failed to define the exact meaning of that term; and in particular she failed to specify whether the phrase was restricted to natural born issue or also included adopted children. The record is likewise devoid of any extrinsic evidence which might have disclosed the intent of the trustor. Thus, in order to give proper meaning to the term "lawful issue," we direct our attention to the statute and legislative policy prevailing in 1923 and 1930 as the only significant legal factor from which the intent of the trustor may be rightly inferred.

Before turning to the relevant statutes and case law in order to divine the intent of the trustor, we underline that the trust documents at hand describe the remaindermen, the class of takers, as the *lawful issue of Frederick,* not of Mrs. Moody. ▆▆▆ The precise question before us, therefore, is not whether the adoptive claimants would be regarded as Mrs. Moody's lawful issue, but rather whether under the California law existing in 1923 and 1930 they were rightfully considered as the lawful issue of Frederick, their adoptive parent. We believe that the California statutes and case law existing prior to and at the time of the execution of the trust documents give an unmistakable, clearcut answer to this question.

As early as 1888 it was established in California that the word "issue" included both adopted and natural children. The statutes of succession then existing provided that adopted children must be treated in all respects as the natural children of the adopting parents (Civ. Code, § 227), and that they possess all the rights and duties of natural children (Civ. Code, § 228). Relying on these sections as well as section 1386 of

the Civil Code, our Supreme Court declared in *In re Newman* (1888) 75 Cal. 213, 219 [16 P. 887]: "If the adopted child is by virtue of its *status* to be 'regarded and treated in all respects as the child of the person adopting,' and is to 'have all the rights and be subject to all the duties of the legal relation of parent and child,' the right to succeed to the estate of the deceased parent must be included." Incorporating the rule espoused in *Newman*, Probate Code, section 257, enacted in 1931, likewise provided in part that "An adopted child succeeds to the estate of one who has adopted him, the same as a natural child; and the person adopting succeeds to the estate of an adopted child, the same as a natural parent."

Appellants argue, however, that the aforestated rules do not apply to the instant case. In the determination of the rights of an adopted child under a will or similar document—say appellants—the controlling question is not whether the adopted child would inherit from its adoptive parent under the statutes of succession, but whether the adopted child is included among the persons the testator intended to share in his estate (*Estate of Pierce* (1948) 32 Cal.2d 265, 269 [196 P.2d 1]). In reliance mainly on outside cases and authorities, appellants insist that absent contrary intent by the testator, the terms "issue," "children," or "heirs," in a will are intended to refer to natural or blood relationship and would not include an adopted child (*Comer* v. *Comer* (1942) 195 Ga. 79 [23 S.E.2d 420]; *In re Wehrhane's Estate* (1957) 23 N.J. 205 [128 A.2d 681]; 95 C.J.S., Wills, § 666, pp. 982-984). We disagree with appellants for a number of reasons.

First, while the cases outside California are in conflict as to whether the term "issue" in a will includes also an adopted child in the absence of the testator's express intent, California is committed to the view that wills, too, must be read and construed in harmony with the legislative policy of placing adopted children on a level with natural born offspring. ■ Accordingly, California follows the line of authorities which consider the word "issue" to embrace all lineal descendants, including adoptive children (*Riddle* v. *Peters Trust Co.* (1946) 147 Neb. 578 [24 N.W.2d 434]; *In re Upjohn's Will* (1952) 304 N.Y. 366 [107 N.E.2d 492]; *Pearce* v. *Rickard*, 18 R.I. 142 [26 A. 38]; 95 C.J.S., Wills, § 666, subd. (c)(3)(b), p. 984; see *Estate of Heard, supra,* at pp. 518-519, 522).

■ Second, California explicitly holds that in ascertaining the testator's intention the adoption statutes may be considered, and in view

of such statutes "issue" or "lawful issue" may include adopted children (*Estate of Heard, supra,* at p. 521).

██ Third, it is well settled that words in private instruments should ordinarily, in the absence of showing a contrary intent, be accorded the effect given them by statutory or case law (Rest., Contracts, § 234; *Weinreich E. Co.* v. *A. J. Johnston Co.* (1915) 28 Cal.App. 144, 146 [151 P. 667]) prevailing at the time of the execution of the documents (*Williams* v. *Ward* (1971) 15 Cal.App.3d 381, 385 [93 Cal.Rptr. 107]). ██ It bears special emphasis that in the case at bench in both 1923 and 1930 when the respective documents were executed, section 1334 of the Civil Code provided in explicit terms that where, as here, a testamentary disposition was made to the "issue" of any person without further qualification or elaboration, it vested the property in those who were entitled to take under the laws of succession.[4]

This statutory definition is dispositive of the controversy at bench. Whatever weight might have been given to appellants' argument that the phrase "lawful issue" defies uniform interpretation in the case law and legal literature and might or might not include adopted children, the issue raised by appellants has been mooted by the statutory definition of the disputed term, which also reflects the public policy of California on this subject. It is, of course, axiomatic that the testator is bound to know the existing statutes affecting testamentary dispositions (95 C.J.S., Wills, § 589, p. 726 et seq.), and also that technical terms used in a will or similar document are deemed to have been used and accepted by the testator in accordance with its legal definition (*Estate of Thompson, supra*). It is likewise beyond dispute that, under precepts espoused in *In re Newman, supra,* the adoptive claimants were entitled to succeed to Frederick's estate under the laws of intestacy effective in 1930.

Fourth, the conclusion reached above is also impelled by *Estate of Heard, supra,* which presents an almost identical factual situation and legal dispute. In *Heard,* the testatrix, Emma Heard, executed a will in 1935 and died in 1939. The will established a trust providing for several income interests. After payment each month of fixed dollar amounts to

---

[4]Section 1334 of the Civil Code provided at the relevant times (1923 and 1930) that "*A testamentary disposition to* 'heirs,' 'relations,' 'nearest relations,' 'representatives,' 'legal representatives,' 'personal representatives,' or 'family,' '*issue,*' 'descendants,' 'nearest' or 'next of kin' *of any person,* without other words of qualification, and when the terms are used as words of donation, and not of limitation, *vests the property in those who would be entitled to succeed to the property of such person, according to the provisions of the Title on Succession, in this Code.*" (Italics added.)

several named beneficiaries, the residue of the trust income was to be paid to Emma's son John, " 'or if he be deceased, then to his lawful issue, if any, distributed per stirpes and not per capita.' " If John "should 'leave no lawful issue at the time of his death,' " then the income was to be paid to one May Cummings until her death and then to her living issue.

In 1950, 11 years after the death of the testatrix, John adopted a child, John III. Five years later, in 1955, John died. Upon his death the trustee petitioned the court under section 1120 of the Probate Code for instructions as to how to distribute John Heard's "residue" share of income, that is, the income remaining after payment of the fixed dollar amounts to the named beneficiaries. The descendants of May Cummings claimed they were entitled to the share, contending that John had died without lawful issue. Similar to the case at bench, the question presented to the court was whether John's adopted child, John III, qualified as his lawful issue as the term was used by the testatrix. In holding that the testamentary disposition to the "lawful issue" of the testatrix's son included John III, the adopted child of John, the court applied the rule that "Courts . . ., by necessity, draw on the statutes, case law and public policy in construing an instrument as they must suppose that the draftsman did not intend to pursue a course contrary to them unless he so states." After emphasizing that the testator is bound to know existing statutes relating to testamentary dispositions, the court went on to say: "We cannot suppose that wills are made in a vacuum; that the status of an adopted child being the same as a biological offspring, which is the public policy of the state, may be completely ignored, or that it was ignored by a testator when making a will any more than he may be said to ignore many other rules of law and public policy. *When he has not said anything about 'adopted' children . . ., the court must assume, unless a contrary intent is expressed, that he intended that his will* would fit it and *be compatible with the general body of the law and public policy.*" (*Estate of Heard, supra,* at p. 522; italics added.)

■ Appellants' alternative contention that in the case at bench the general purpose and scheme of the trust evinces the intent of the trustor to keep the trust benefits in her blood line cannot be accepted either.

To begin with, the trust scheme to be gleaned from the 1923 original agreement and the 1930 amendment reveals no more than that Mrs. Moody intended to restrict the *income* interest in the trust to certain members (the children and grandchildren) of her own family. Character-

istically enough, however, Mrs. Moody did not leave the remainder shares, the corpus of the trust to her own issue, but rather to issue of the named income beneficiaries. But aside from this, appellants' argument that the adopted children were intended to be excluded from the trust benefits is negated by the additional fact that the ultimate remaindermen under the trust who are entitled to take the shares in case the life income beneficiaries died without leaving issue are "the heirs-at-law of the Trustor as determined by the Statutes of Succession of California *then* in force." (Italics added.) It is, of course, beyond controversy that under the present California statute the adoptive children take not only *from,* but also *through* the adopting parent,[5] and as a consequence they are fully entitled to participate in the distribution of the trust assets under the heirs-at-law clause.

Appellants' additional claim that in the case at bench a result different from *Heard* should be reached because respondents were adopted well after the trustor's death, and their adoption was neither known nor anticipated by Mrs. Moody, requires just passing consideration. Suffice it to say that similar to the present case the child in *Heard* was also adopted some 11 years after the testatrix's death. Nevertheless, the Supreme Court, based upon strong policy considerations, concluded that he must be regarded as lawful issue within the meaning of the trust provisions. By parity of reasoning, the very same applies to the case at bench.

Lastly, we are satisfied that the cases referred to by appellants are readily distinguishable from the case at bench and in no way compel a different conclusion. Thus, in *Estate of Pierce, supra,* unlike the present case, extrinsic evidence was introduced showing that the testator intended to exclude adopted children from taking under the will. In *Estate of McCormack* (1969) 2 Cal.App.3d 492 [82 Cal.Rptr. 651], too, there was extrinsic evidence indicating the trustor's intent, and in addition the language of the trust agreement itself stated that " 'It is particularly my desire to keep my estate in my only family.' " From these words, combined with the extrinsic evidence, the court was justified in concluding that the testatrix's intention was to leave her estate to people related to her by blood (*Estate of McCormack, supra,* at p. 497). The trust instruments at hand indicate no intention of that sort. *Abramovic v. Brunken* (1971) 16 Cal.App.3d 719 [94 Cal.Rptr. 303] is also distinguish-

---

[5]As amended in 1955, section 257 of the Probate Code provides in part that "An adopted child shall be deemed a descendant of one who has adopted him, the same as a natural child, for all purposes of succession *by, from or through* the adopting parent the same as a natural parent." (Italics added.)

able from the case at bench. In *Abramovic*, the language of the will itself was again indicative that by using the phrases "children" and "issue" the testator contemplated biological, matrimonial descendants.[6] Besides, Bertha, the person adopted by the testator's son was a 32-year-old adult at the time of her adoption, which would have been impermissible under the law existing at the time of the execution of the will, and the adoption took place one year before the final distribution of the estate. From these facts the court could logically infer that Bertha's adoption was an apparent attempt to defeat the remaindermen in the prospective distribution of the estate. It goes without saying that none of these circumstances exist in the case at bench.

The judgment is affirmed.

Taylor, P. J., and Rouse, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 1, 1976.

---

[6]The pertinent part of the testamentary trust read as follows: " '*In the event that my said son should marry,* then and in such event instead of and in place of such trust *I give to the children,* if any, *of said* JOHN BRUNKEN, a one-fourth (¼) interest in and to any lands owned by me at the time of my death . . . . *In the event* that the said JOHN BRUNKEN *shall not marry and if married shall have no issue,* then it is my will and direction in the event of the death of said JOHN BRUNKEN that the said one-fourth (¼) interest herein mentioned shall go to my heirs at law or their representatives by right of succession.' " (*Abramovic* v. *Brunken, supra,* at p. 721; italics added).