[No. B216632. Second Dist., Div. Eight. Nov. 5, 2010.]

CITIZENS BUSINESS BANK, as Trustee, etc., Plaintiff and Respondent, v. JONATHAN CARRANO, Defendant and Appellant; DONNA KAZANJIAN et al., Defendants and Respondents.

COUNSEL

Karl W. Schoth; Benedon & Serlin, Gerald M. Serlin and Shona Armstrong for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Emling Forensis, Michael J. Emling; and Joseph E. Porter III for Defendants and Respondents.

---

OPINION

**O'CONNELL, J.**[*]—This matter stems from a dispute over whether a child born out of wedlock is a beneficiary of his biological grandparents' trust. The trial court found the trust instrument ambiguous and that his grandparents did not intend for him to be a beneficiary under their trust. We reverse because we find the terms of the trust are unambiguous and remand with instructions.

## FACTS

The facts in this matter are generally undisputed and taken from a joint trial statement submitted to the trial court below. Charles and Serena Papaz created the Papaz Family Trust on August 2, 1966. Charles and Serena had one child, Christopher.[1] Christopher fathered three children out of wedlock: Jonathan Carrano, Christopher Brewington and Robert Goerss. Only Jonathan's status is the subject of this appeal.

### 1. *Christopher Fathers a Child out of Wedlock*

Christopher met Jonathan's mother, Kathy Carrano, when he was shot in the leg in 1984. She was Christopher's physical therapist while he was in the hospital and she continued to care for him during his recovery at his parents' home. One night, Christopher gave Kathy a drug and had sex with her without her knowledge. Jonathan was conceived that night. Kathy was married to another man at the time. Jonathan was born in August 1985. Kathy

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] For convenience and with no disrespect intended, we will refer to the parties by their first names.

and her husband raised Jonathan as their child. A few years after he was born, Kathy learned that Jonathan was Christopher's son and not her husband's. Jonathan was never formally adopted by Kathy's husband.

Christopher, however, appeared to be aware that Jonathan was his son from the beginning. He bragged to his friend, Vahe Tatoian, when Kathy was pregnant that, "I know this is my kid." He again acknowledged Jonathan as his son to Vahe in 2004, but refused to tell his father, Charles. Serena also appeared to know that Christopher had fathered a child. At or around the time of Jonathan's birth, she mentioned to her sister that Christopher may have had a child with a nurse. Serena's sister understood that the nurse she referred to was the one who cared for Christopher while he was recovering from his gunshot wound. In any event, it is undisputed that Jonathan is Christopher's biological son.

Charles and Serena did not approve of Christopher's behavior, particularly his relationships with women and fathering children out of wedlock. They also did not trust Christopher with money and did not want to leave their entire fortune to him outright, believing he would squander it.

### 2. *The Trust Instrument Is Amended to Redefine "Issue"*

As a result, they amended their trust in 1988 (the Eighth Amendment) to, among other things, enable him to receive income from the trust but not the assets themselves. An attorney revised the trust each time. Under the Eighth Amendment to the trust, Christopher's "issue" would receive the trust assets in the event Christopher did not survive his parents. "Issue" was defined in the Eighth Amendment as follows: "As used in this trust, the term 'issue' shall refer to lineal descendants of all degrees and the terms 'child,' 'children' and 'issue' shall include persons adopted into the Trustors' bloodline and shall exclude persons adopted out of the Trustors' bloodline. As used in this trust, the term 'then-living issue' shall include any issue that has been conceived prior to and is born after the time such issue acquires an interest in this trust." In 1991, Charles and Serena amended the trust a ninth time to redefine the term "issue" to expressly exclude "persons adopted into the Trustors' bloodline" and "persons adopted out of the Trustors' bloodline." If Christopher had no issue, then one-half of the trust assets would go to Charles's heirs—his sister's children—and one-half to Serena's heirs—her sister.[2] Charles and Serena subsequently amended the trust two additional times with the last revision occurring in 2004; they did not change the definition of "issue" again.

---

[2] Serena's sister and Charles's nieces and nephews are the respondents in this matter.

In December 2006, Christopher became paralyzed from his neck down and could no longer speak. In January 2007, Kathy told both Jonathan and Charles that Christopher was Jonathan's biological father. Jonathan introduced himself to Charles, saying, "I am Jonathan, your grandson, Christopher's son." Charles "reached over and grabbed [Jonathan's] hand and said, 'I know.' " Though Jonathan visited both Christopher and Charles regularly thereafter, Charles never acknowledged him as his grandson, and in fact referred to him as "Leroy." However, there was evidence Charles acknowledged to his attorney and banker that Jonathan was his grandson during financial discussions where Jonathan was present. There is no contention that Charles was not lucid during this time, though it is undisputed he was very ill. Christopher died on June 22, 2007. His father died shortly afterwards, on July 8, 2007. Serena predeceased Charles and Christopher on November 11, 1996.

### 3. *The Trial over the Trust Beneficiaries*

In February 2008, Citizens Business Bank, as trustee of the Papaz Family Trust, filed a petition for an order ascertaining beneficiaries and determining entitlement to distribution. In a bench trial, the trial court heard testimony consistent with the facts stated above from Kathy, Jonathan, Vahe Tatoian, Serena's sister and the other potential beneficiaries. In an order dated March 9, 2009, the trial court found that "Jonathan is not considered a child of Christopher."

To reach this decision, the trial court held that "[t]he trust is not specific concerning the rights of someone in Jonathan's circumstances. The trust does not in its language suggest whether Christopher's child born out of wedlock and into an extant family that does not include Christopher should be included as a lineal descendant under the trust." As a result of the ambiguity, the court considered extrinsic evidence to determine the trustors' intent. The court ascertained Charles and Serena's intent was to restrict who might be considered Christopher's issue. The court concluded: "it appears that Jonathan is excluded from distribution under the trust as he does not fall within the definition of issue as the trustors intended. The trustors seem to have intended issue to be children who are biologically related to Christopher and for whom Christopher was legally a parent. As Jonathan was conclusively presumed to be the child of another man pursuant to Family Code section 7540, Jonathan's biological connection to Christopher is insufficient under the trust to fall within its definition of issue." Jonathan appeals from the resulting final order dated April 3, 2009.

### DISCUSSION

The ultimate question in this case is whether the Papaz Family Trust's definition of "issue" includes Jonathan. Jonathan argues that the term "issue"

in the trust instrument is unambiguous. We agree. We consider the issue de novo because the interpretation of the trust does not require us to resolve conflicts in the evidence. (*Burkett v. Capovilla* (2003) 112 Cal.App.4th 1444, 1449 [5 Cal.Rptr.3d 817].) Whether an ambiguity exists in a writing is an issue of law subject to independent review on appeal. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 847 [57 Cal.Rptr.3d 363].)

■ Our Supreme Court's opinion in *Estate of Russell* (1968) 69 Cal.2d 200, 205–206 [70 Cal.Rptr. 561, 444 P.2d 353] lays the foundation for our interpretation of a trust instrument: " 'The paramount rule in the construction of wills, to which all other rules must yield, is that a will is to be construed according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible.' [Citation.]" (*Id.* at p. 205.) However, the court acknowledged that extrinsic evidence is "admissible 'to explain any ambiguity arising on the face of a will, or to resolve a latent ambiguity which does not so appear.' [Citation.]" (*Id.* at p. 206.)

The *Estate of Russell* court further explained the prohibition against extrinsic evidence where the instrument is clear: " 'The rule is well established that where the meaning of the will, on its face, taking the words in the ordinary sense, is entirely clear, and where no latent ambiguity is made to appear by extrinsic evidence, there can be no evidence of extrinsic circumstances to show that the testatrix intended or desired to do something not expressed in the will.' However, this ancient touchstone has not necessarily uncovered judicial material of unquestioned purity." (*Estate of Russell, supra*, 69 Cal.2d at p. 208, fn. omitted, quoting *Estate of Willson* (1915) 171 Cal. 449, 456 [153 P. 927].)

■ The court went on to provide guidance in assessing whether ambiguities exist. "[T]he court must examine the instrument in the light of the circumstances surrounding[] its execution so as to ascertain what the parties meant by the words used. Only then can it be determined whether the seemingly clear language of the instrument is in fact ambiguous." (*Estate of Russell, supra*, 69 Cal.2d at pp. 208–209.) Therefore, a latent ambiguity is said to exist when the trust language is " 'fairly susceptible' " to more than one interpretation. Otherwise, extrinsic evidence is not permitted to show a different intent. (*Id.* at p. 211.) Typically, latent ambiguities arise where two persons or things answer the description of a bequest, or where there is a mistaken description and one or more persons match a portion of the bequest. (*Taylor v. McCowen* (1908) 154 Cal. 798, 802 [99 P. 351].)

With these principles in mind, the court in *Estate of Russell* was asked to interpret a will, which, on its face, revealed no ambiguity. There, the decedent left her entire estate, excluding a $10 gold piece and diamonds, to " 'Chester H. Quinn & Roxy Russell.' " (*Estate of Russell, supra*, 69 Cal.2d at p. 203.) Extrinsic evidence revealed that Roxy Russell was the decedent's dog, who could not, under the Probate Code then in existence, be a beneficiary. (*Id.* at p. 215.) As a result, the trial court found that the will was ambiguous as to how the dog's share of the estate would be distributed. Based upon the introduction of extrinsic evidence, the trial court determined that the decedent intended to bequeath her entire estate to Quinn to use whatever portion was necessary to care for and maintain the dog. (*Id.* at p. 214.)

The Supreme Court rejected the trial court's interpretation of the will. The *Estate of Russell* court found that the terms of the will were not reasonably susceptible to the meaning proffered by Quinn because no words of the trust actually stated that Quinn was to receive the entire sum provided he care for the dog. (*Estate of Russell, supra*, 69 Cal.2d at pp. 214–215.) Instead, the only meaning to which the will reasonably could be susceptible was that the decedent intended to leave the dog and Quinn her estate in equal shares as tenants in common. Because the dog was unable to recover under the will, its portion would pass to the decedent's heirs at law. (*Id.* at p. 216.)

Likewise, *Estate of Dye* (2001) 92 Cal.App.4th 966 [112 Cal.Rptr.2d 362], is instructive. The will provided that the estate be given to his wife as her " 'sole and separate property.' " An adopted-in son claimed the phrase "sole and separate property" was ambiguous thereby requiring the introduction of extrinsic evidence. The son attempted to introduce evidence to show that his adopted-out brothers should not receive anything under the will. The Court of Appeal held that the phrase was not a latent ambiguity. The court rejected the son's contention finding that he was seeking to inject new language and ideas into the will. (*Id.* at p. 979; see also *Vincent v. Security-First Nat. Bk.* (1945) 67 Cal.App.2d 602, 610 [155 P.2d 63].)

In contrast, the Supreme Court found ambiguity in *Estate of Dominici* (1907) 151 Cal. 181 [90 P. 448]. There, the trial court found a latent ambiguity where the decedent's will identified a beneficiary by name but described a completely different person. The decedent bequeathed his estate to " 'Heinrich Schluter, and to his sister, my niece, whose name is Marie Kohler, and whose residence is Salzwedel, Altmark, Germany, share and share alike.' " (*Id.* at p. 183.) Extrinsic evidence revealed that Marie Kohler was not Heinrich Schluter's sister and she had never lived in Salzwedel,

Germany. (*Id.* at pp. 183–184.) The question then became whether the decedent intended the beneficiary to be the niece he named or the one he described. (*Id.* at pp. 183–184.) The Supreme Court upheld the admission of extrinsic evidence to explain the discrepancy. It did confirm, however, that extrinsic evidence is not admissible to change a testator's intent. (*Id.* at p. 185; see also *Estate of Black* (1962) 211 Cal.App.2d 75, 85–86 [27 Cal.Rptr. 418] [latent ambiguity existed where will detailed bequest to " 'The University of Southern California known as The U.C.L.A.' "].) We find that this is not a case where extrinsic evidence reveals an ambiguity that must be resolved as in the situation presented in *Estate of Dominici*. Indeed, respondents do not rely on the facts of these cases to argue their cause.

Instead, respondents contend that "[t]he text of the trust does not address the special case of an out of wedlock child who was born into a different family, who was legally the child of another man, and who was unknown to the family until the final months of his grandfather's, the surviving trustor's life." As a result, they argue a latent ambiguity exists whether Serena and Charles intended this "special case" to be the primary beneficiary of their trust. According to respondents, the term "issue" is fairly susceptible of two or more constructions because Charles and Serena intended to restrict the meaning of "issue." They argue that it is reasonable to interpret "that a person born out of wedlock, and legally a member of another family should be treated as outside the class of 'issue.' " We disagree.

Just as in *Estate of Russell*, we are not at liberty to rewrite the Papaz Family Trust to attach restrictions to the term "issue" that Serena and Charles did not expressly include. (*Estate of McAuliffe* (1955) 132 Cal.App.2d 476, 480 [282 P.2d 541] [court will not impute ambiguity to otherwise "simple, clear and specific" language evidencing testator's intent].) Here, Serena and Charles, through their lawyers, chose to define the term "issue" as a class of people who were lineal descendants of Christopher and who had not been adopted out of the bloodline.[3] Later, the lawyers revised the trust instrument to include lineal descendants of Christopher who had not been adopted into or out of the bloodline. The definition of "issue" was drafted by lawyers and

---

[3] Respondents argue, in passing, that the trial court took judicial notice of several definitions of the word "adopt" which include taking a child into one's family by choice, without reference to legality. Respondents contend that Jonathan "offers no evidence or analysis to suggest that the meaning is confined to formal statutory adoption." However, " '[w]here an instrument has been drawn by one skilled in the law, the presence of legal and technical terms is an indication that the legal term of art has been used, and therefore is to be accepted, in accordance with its legal definition. [Citations.]' " (*Newman v. Wells Fargo Bank* (1996) 14 Cal.4th 126, 136 [59 Cal.Rptr.2d 2, 926 P.2d 969], quoting *Wells Fargo Bank v. Huse* (1976) 57 Cal.App.3d 927, 932 [129 Cal.Rptr. 522].) There is no dispute that the Papaz Family Trust was drawn up by Charles and Serena's attorneys.

amended. Neither of those restrictions apply to Jonathan, plainly Christopher's lineal descendant.[4] That Charles and Serena failed to expressly describe Jonathan's "special case" does not create a latent ambiguity. The extrinsic evidence further supports this conclusion. Christopher boasted that Jonathan was his son. Serena stated to others that she suspected Jonathan was her grandson. Charles spoke to his banker and lawyer describing Jonathan as his grandson. While Charles and Serena were religious, conservative and disapproving of Christopher's affairs, that does not reasonably imply they intended to disinherit their biological grandchildren born out of wedlock. If Charles and Serena intended Christopher's issue only to include children who are biologically related to him and the issue of a legal marriage, they could have said so. (*Estate of Casey* (1982) 128 Cal.App.3d 867, 874 [180 Cal.Rptr. 582, 198 Cal.Rptr. 170] ["Extrinsic evidence of any type cannot be used to reach an interpretation which substitutes affirmative dispository language for silence. That would amount to rewriting the will."].)

Neither is this a case where the critical terms are undefined and we are left to interpret the trust by statutory means, as urged by respondents. In *Newman v. Wells Fargo Bank, supra,* 14 Cal.4th 126, a case relied upon by respondents, the term "issue" was not defined. As a result, the question facing the court was, given an ambiguous provision in the will, which law should apply to determine whether a child adopted out of the family was among the "issue" of the testator—the law in effect at the time the will was executed or at the time of the testator's death. (*Id.* at p. 129; see also *Estate of Dodge* (1971) 6 Cal.3d 311, 318 [98 Cal.Rptr. 801, 491 P.2d 385] [no definition of " 'personal property' "]; *In re Estate of DeLoreto* (2004) 118 Cal.App.4th 1048, 1052 [13 Cal.Rptr.3d 513] [no definition of "grandchildren" and it was undisputed the testator had no relationship with and did not intend to benefit any grandchildren adopted as adults]; *Estate of Furia* (2002) 103 Cal.App.4th 1, 3 [126 Cal.Rptr.2d 384] [no definition of "issue" in will so court looked to definition in Prob. Code].)

■ As discussed above, the term "issue" was clearly, simply and specifically defined by Serena and Charles. There is no latent ambiguity attached to it. It is not "fairly susceptible" to any other interpretation. Because the term "issue" is not ambiguous, we need not resort to the Probate Code or Family Code to interpret the term.

---

[4] Though they indicate that the term "lineal descendent" may be ambiguous, respondents fail to provide any alternate definition for the term or even clearly state why they consider the term ambiguous. Importantly, respondents do not seriously argue that Jonathan is not Christopher's lineal descendent.

## DISPOSITION

The order ascertaining beneficiaries and determining entitlement to distribution dated April 3, 2009, is reversed insofar as it applies to Jonathan Carrano. The matter is remanded for entry of a new order instructing the trustee to distribute the trust assets to Jonathan Carrano as the issue of Christopher Papaz within the meaning of the trust. Each party to bear his or her own costs on appeal.

Rubin, Acting P. J., and Flier, J., concurred.