[No. G032020. Fourth Dist., Div. Three. Mar. 30, 2004.]

MARTINE EHRENCLOU et al, Plaintiffs and Respondents, v.
STEVEN MACDONALD et al, Defendants and Appellants;
ANIMAL LEGAL DEFENSE FUND, etc., Intervener and Appellant.

## COUNSEL

Weinstock, Manion, Reisman, Shore & Neumann, M. Neil Solarz and Blake A. Rummel for Defendants and Appellants.

Morrison & Foerster, Shirley M. Hufstedler, Joseph L. Wyatt, Jr., and Sheila O. Recio for Intervener and Appellant.

Loeb & Loeb, Andrew S. Garb, David C. Nelson; Oldman, Cooley, Leighton & Sallus and Marc L. Sallus for Plaintiffs and Respondents.

OPINION

**IKOLA, J.**—On a petition for instructions regarding the proper distribution of the remaining assets held in a trust, the court ruled that adults adopted under Colorado's adult adoption statute did not qualify as "issue" of the person adopting them. The adopted adults, joined by a group of intervening charities, appeal. We affirm the judgment.

## FACTS AND PROCEDURAL BACKGROUND

In late 1954, Jacob Paley (Jacob) created a trust (the 1954 trust), which, upon his death, would provide for his adopted daughter Jacqueline Paley Wolber (Jacqueline) and Jacob's grandchildren.[1] Now, some 50 years later, we are called upon to decide how the remaining assets of that trust are to be distributed.

Jacob died in 1960. Under the terms of the 1954 trust, upon Jacob's death the assets were divided between Jacqueline and "each of her children then living." The shares of Jacqueline's "children then living" were placed in separate trusts, allowing discretionary pay-outs for support, maintenance, comfort and education, and requiring one-third of the principal to be distributed to the children at ages 30, 35, and 40. Jacqueline's share was also retained in trust from which she received the net income for life. Upon Jacqueline's death, her trust was to be terminated, and the assets "distributed by the trustees to her then living lawful issue per stirpes."

Jacqueline's "children then living" upon Jacob's death were Martine Ehrenclou (Martine) and Konrad M. Bors (Konrad). But in 1992, thirty-two years after Jacob's death, Jacqueline, then residing in Colorado, adopted Steven MacDonald (Steven) and Cynthia Hutt (Cynthia) as adults under the provisions of section 14-1-101 of the Colorado Revised Statutes.

Jacqueline died in 2001. Upon her death, Martine and Konrad petitioned the court for instructions pursuant to section 17200 of the Probate Code,[2] requesting the court (1) to declare they were the *only* "living lawful issue" of Jacqueline, thereby excluding Jacqueline's adult adoptees, Steven and Cynthia, from taking a share of the remaining assets of the 1954 trust, and (2) instructing the trustee to distribute the remaining assets of the 1954 trust to Martine and Konrad equally. Thus, the court was asked to determine whether Steven and Cynthia qualify as Jacqueline's "living lawful issue" under the terms of Jacob's 1954 trust.

---

[1] We use the first names of the parties, not intending any disrespect, but because the parties themselves do so, and for easier reading.

[2] All statutory references are to the Probate Code unless otherwise stated.

The Animal Legal Defense Fund (ALDF) intervened in the dispute on behalf of itself and as a representative of a class of 12 charities. The charities are interested in the outcome of this dispute because in addition to the 1954 trust, Jacob had created another trust for Jacqueline's benefit in 1937 (the 1937 trust). The 1937 trust gave Jacqueline a testamentary power of appointment, which allowed her to dispose of its assets as part of her own estate. Jacqueline exercised her power of appointment by providing in her will that one-half of the residue of her estate, including the assets of the 1937 trust, would pass to Steven and Cynthia, but only if they were not permitted to take under the 1954 trust. The remainder of the residue would pass to some 12 charities, including the ALDF. Thus, if Steven and Cynthia take under the 1954 trust, the distribution to the charities, including ALDF, is doubled. For this reason, the ALDF, on behalf of itself and 11 other charities, joined with Steven and Cynthia in opposing Martine's and Konrad's petition for instructions.

On cross-motions for summary judgment, the court excluded Steven and Cynthia from the class of "living lawful issue." The court based its ruling on its conclusion that under the law of the State of Colorado "adult adoption . . . create[s] in the adoptee only the status as heir at law to the person adopting, and such adoptee does not, by virtue of the adoption, become a 'child' or 'issue' of the person so adopting, and inheritance flows only through intestate succession of the adopting person and not as 'issue' of such persons." The court further concluded that it was required to determine the status of Steven and Cynthia under Colorado law by reason of the "Full Faith and Credit Provisions of both State and Federal Law." Accordingly, the court granted Martine's and Konrad's summary judgment motion, denied Steven's and Cynthia's summary judgment motion, and granted the petition for instructions as requested by Martine and Konrad.

## DISCUSSION

Appellants (Steven, Cynthia, ALDF, and the other charities) contend the court erred by applying Colorado law to determine whether Steven and Cynthia qualified as members of the class of Jacqueline's "living lawful issue." Appellants argue California law must be applied, as directed by Jacob's language in his 1954 trust, to "determine what incidents to accord to Steven and Cynthia's adoption decrees." Since Jacob expressed no contrary intent, they argue, "the Court must assume that he intended his Trust to 'fit it and be compatible with the law and public policy' in effect at the time he executed the Trust document." According to appellants, the public policy of California requires courts "to treat adopted adults the same as natural children," the "Full Faith and Credit Clause does not require adherence to Colorado law," and is thus "completely irrelevant."

We agree with appellants that California law must be applied "with no exceptions." But we also conclude the application of California law requires us to determine the legal relationship between Jacqueline and her two adult adoptees, Steven and Cynthia, under Colorado law.

*The 1954 Trust is Presumed to Include Within the Class of "Living Lawful Issue" Adopted Persons Having a Parent-Child Relationship With the Adopting Person*

Appellants argue, and we agree, Jacob plainly stated his choice of law: "This instrument and all matters pertaining to the administration, execution and performance of this trust shall be governed and determined in all respects by and in accordance with the laws of the State of California." Subject to exceptions not here applicable, California law requires us to honor Jacob's choice. "The meaning and legal effect of a disposition in an instrument is determined by the local law of a particular state selected by the transferor in the instrument . . . ." (§ 21103.)

Appellants also argue, and we agree, "the cases emphasize that among the circumstances to be considered [when interpreting the language of an instrument] are relevant statutes, case law and public policy in effect at the time of the execution of the document which, in the absence of a contrary intent, are deemed to become a part of the testamentary scheme." (*Wells Fargo Bank v. Huse* (1976) 57 Cal.App.3d 927, 933 [129 Cal.Rptr. 522].) Normally, of course, "the courts may [also] consider and examine the circumstances surrounding the execution of the document in order to ascertain what the parties meant by the words used." (*Id.* at pp. 932–933.) But here, the bare language of the trust instrument, including the date it was executed, is the only evidence presented to the court concerning the circumstances surrounding its execution. Or, if we stretch the reach of "surrounding circumstances" to a date 17 years earlier, the evidence established that Jacob also created a 1937 trust which gave Jacqueline a testamentary power of appointment over its assets. The 1954 trust, however, did not give Jacqueline a power of appointment.

■ Our Supreme Court recently affirmed that "[a] testator is presumed to be aware of the public policy reflected in the statutory definitions of the terms used in a will *at the time the will is executed* and to intend that those definitions be followed in construction of the will unless a contrary intent is expressed in the will. This presumption is strongest when an attorney has drafted the will because '[w]here an instrument has been drawn by one skilled in the law, the presence of legal and technical terms is an indication that the legal term of art has been used, and therefore is to be accepted, in accordance with its legal definition.' " (*Newman v. Wells Fargo Bank* (1996)

14 Cal.4th 126, 136 [59 Cal.Rptr.2d 2, 926 P.2d 969], italics added.) The court continued, "We presume that provisions in a will are made with an understanding of, and an intent to act pursuant to, the law and public policy as it exists when the will is executed. It is more reasonable to assume that a testator who intends a different disposition will make express provision governing the status of adopted children than to assume that the testator intends that their status not be established until some future time and be contingent upon legislative fiat." (*Id.* at p. 140.) For these reasons, the *Newman* court concluded that the law and public policy to be considered when a will provision must be interpreted is that which was in effect when the will was executed, not the law and public policy in effect at the time the construed words will take effect. (*Id.* at p. 129.)

The rule is the same when construing an inter vivos trust. "[T]he primary duty of the court in construing all documents is to give effect to the intention of the maker, and we can see no justification for any distinction in this regard between instruments operating *inter vivos* and those taking effect at death since the intention to be gathered from similar words or provisions, whether they be contained in a declaration of trust or a will, would ordinarily be the same." (*Brock v. Hall* (1949) 33 Cal.2d 885, 889 [206 P.2d 360]; see also *Burch v. George* (1994) 7 Cal.4th 246, 254, fn. 5 [27 Cal.Rptr.2d 165, 866 P.2d 92]; *Copley v. Copley* 126 Cal.App.3d 248, 270 [178 Cal.Rptr. 842]; *Well Fargo Bank v. Huse, supra,* 57 Cal.App.3d 927, 932.) Jacob executed the 1954 trust on October 19, 1954. Accordingly, we consider the relevant law and public policy as of 1954.

The "relevant statutes, case law and public policy in effect at the time of the execution of the [1954 trust]" (*Wells Fargo Bank v. Huse, supra,* 57 Cal.App.3d 927, 933), included those "embodied in the adoption statutes ([former] Civ. Code, §§ 221, 227, 228) and in the succession statute providing for the inheritance rights of adopted children ([former] Civ. Code, § 257)." (*Estate of Russell* (1971) 17 Cal.App.3d 758, 767–768 [95 Cal.Rptr. 88].) As germane to this appeal, former section 221 of the Civil Code, as it read in 1954, provided that "any adult person . . . may be adopted by any other adult person in the cases and subject to the rules prescribed in Section 227p."[3] Former section 221 of the Civil Code, as it read in 1954, also provided that the words "child" and "children," as used in former section 228, includes "both minor persons and adult persons." Former section 228 of the Civil Code, as it read in 1954, defined the legal relationship between the adopting person and the adopted person as follows: "A child [including an adult], when adopted, may take the family name of the person adopting. After adoption, the two shall sustain towards each other the legal relation of parent

---

[3] Former section 227p of the Civil Code sets forth the adoption procedures.

and child, and have all the rights and be subject to all the duties of that relation."

With respect to inheritance rights, former section 257 of the Civil Code provided in 1954: "An adopted child succeeds to the estate of one who has adopted him, the same as a natural child; and the person adopting succeeds to the estate of an adopted child, the same as a natural parent. [¶] An adopted child does not succeed to the estate of a natural parent when the relationship between them has been severed by the adoption, nor does such natural parent succeed to the estate of such adopted child."[4]

Presuming, therefore, that Jacob's words reflected the relevant law and public policy in 1954, they were written with the knowledge that: (1) adult adoptions are permitted in California, (2) when a person is adopted, whether a minor child or an adult, the adopted person and the adopting person enter into a parent-child relationship with all of the attendant rights and duties; but (3) the inheritance rights of the adopted person and the adopting person do not, by reason of the adoption, extend to other persons.

But the 1954 law's limitation of inheritance rights, which excluded inheritance from those not parties to the adoption, does not affect the interpretation of the 1954 trust. The 1954 trust did not describe the contested class gift as going to *Jacob's* "living lawful issue." Rather, it describes the gift as going to Jacqueline's "living lawful issue." As our Supreme Court held in *Estate of Heard* (1957) 49 Cal.2d 514 [319 P.2d 637] (*Heard*) and *Estate of Stanford* (1957) 49 Cal.2d 120 [315 P.2d 681] (*Stanford*), we must decide who Jacob intended to include as the "living lawful issue" of Jacqueline, not of Jacob. Thus, in *Stanford,* the court held, "We are not here concerned with a question of inheritance but with the construction of a will, and whether 'child or children' [of the testator's daughter] includes adopted persons." (*Stanford,*

---

[4] Former section 257 of the Civil Code was amended effective September 7, 1955, to read as follows: "An adopted child shall be deemed a descendant of one who has adopted him, the same as a natural child, for all purposes of succession by, from or through the adopting parent, the same as a natural parent. [¶] An adopted child does not succeed to the estate of a natural parent when the relationship between them has been severed by adoption, nor does such natural parent succeed to the estate of such adopted child, nor does such adopted child succeed to the estate of a relative of the natural parent, nor does any relative of the natural parent succeed to the estate of an adopted child." Because we conclude the 1954 limitation on inheritance rights, which was eliminated by the 1955 statutory amendment, does not affect our interpretation of the 1954 trust, we need not consider the effect of Jacob's amendment to the trust, made effective 23 days after the effective date of the statutory amendment, but executed nine days before the effective date of the statutory amendment. We would not, in any event, consider Jacob's 1955 amendment of the trust to be relevant to a determination of his intent when he used the words "living lawful issue." The trust amendment merely deleted a $30,000 testamentary gift to his son-in-law Richard Bors, because Richard and Jacqueline were divorcing.

*supra,* 49 Cal.2d at p. 142.) And in *Heard* the court also held, "[W]e are concerned not with inheritance but rather with whether the words 'lawful issue' [of the testator's son] used in a will includes an adopted child." (*Heard, supra,* 49 Cal.2d at p. 522.) As both *Heard* and *Stanford* made clear, because an adopted person and the adopting person are, by law, in a parent-child relationship the same as a natural parent and child, and presuming Jacob intended his words to reflect California law, a person adopted under California law is "lawful issue" of the adopting person as those words are used in the 1954 trust.

■ The rationale for the decision in both *Heard* and *Stanford* was the court's recognition that California law places an adopted person in a parent-child relationship with the adopting person, with the relationship giving rise to the same mutual rights and duties as exist between a natural child and a natural parent. "It has been the policy of this state, at least since the adoption of the Civil Code, to accord to adopted children the same status as natural children. 'A child, when adopted, may take the family name of the person adopting. After adoption, the two shall sustain towards each other the legal relation of parent and child, and have all the rights and be subject to all the duties of that relation.' " (*Stanford, supra,* 49 Cal.2d at p. 135.) The *Heard* and *Stanford* decisions were both grounded in the presumption that, unless a contrary intent was expressed, a testator's (or settlor's) words are chosen to reflect the law and public policy of California, the word "issue" commonly means "children," and, therefore, since adopted persons (including adults) are "children" of the adopting person by reason of California's law and public policy, adopted persons qualify as "issue" of the adopting persons as used in the testator's (or settlor's) will or trust.

■ The parent-child relationship is not a matter of mere form. For example, in California, a parent-child relationship between adults in 1954 imposed "the duty of the father, the mother, and the children of any poor person who is unable to maintain himself by work, to maintain such person to the extent of their ability. The promise of an adult child to pay for necessaries previously furnished to such parent is binding." (Former Civ. Code, § 206 [equivalent provisions for mutual support of adult children and parents are now found in Fam. Code, §§ 3910, 4400 and 4401].) And adoption, i.e., the creation of a new parent-child relationship, also severed the former parent-child relationship between the adopted person and his or her natural parents, thereby terminating duties of mutual support between the natural parents and the adopted person. (Former Civ. Code, §§ 228 & 229.) With respect to inheritance rights, the law in 1954 permitted the adopted person and the adopting person to enjoy mutual rights of inheritance, as in any parent-child relationship, while severing all rights of mutual inheritance between the adopted person and the natural parents. (Former Prob. Code, § 257.) Unless the legal relationship between an adopted person and an adopting person

embraces all of the mutual rights and duties of a parent and child, it cannot be said that the adopted person is the "issue" of the adopting person, at least insofar as that word is construed under California law.

## The Colorado Adult Adoptions Did Not Create a Parent-Child Relationship Between Jacqueline, Steven, and Cynthia

To determine whether Steven and Cynthia qualify as Jacqueline's "living lawful issue," i.e., whether they have the *status* of being Jacqueline's children with all the rights and duties between them as parent and child, we look not to a birth certificate, as with a natural child, but to the Colorado adoption decrees—the only documents creating a familial relationship of any kind between Jacqueline, Steven and Cynthia. In doing so, we faithfully follow Jacob's direction to follow "in all respects" the law of the State of California.[5]

■ California law provides that "the effect of a judicial record of a sister state is the same in this state as in the state where it was made . . . ."[6] (Code Civ. Proc., § 1913, subd. (a).) Without question, an adoption decree is a judicial record within the meaning of section 1913. (*Estate of Hart* (1984) 165 Cal.App.3d 392 [209 Cal.Rptr. 272] [giving effect to decision of Oklahoma Supreme Court affirming validity of Oklahoma decree of adoption]; cf. *Smith v. Smith* (1952) 115 Cal.App.2d 92, 102 [251 P.2d 720] [Kansas decree of divorce treated as a judicial record under Code Civ. Proc., § 1913]; *Little v. Stevens* (1972) 23 Cal.App.3d 112, 113 [99 Cal.Rptr. 885] [ordinary money judgment is a judicial record within meaning of Code Civ. Proc., § 1913].) Here, certified copies of the decrees of adoption were lodged with the court showing they were filed in the District Court of Jefferson County, Colorado on May 6, 1992. Accordingly, if the Colorado adoption decrees established a parent-child relationship with Jacqueline, Steven and Cynthia will qualify as Jacqueline's "lawful issue" as those words are used in the 1954 trust. If the Colorado adoption decrees do not establish a parent-child relationship, Steven and Cynthia will not qualify as "lawful issue" for purposes of the 1954 trust.

We begin with the language of the Colorado statute under which Steven and Cynthia were adopted. Colorado Revised Statutes, section 14-1-101, subdivision (1), provides: "Any person desiring to adopt an adult *as heir at*

---

[5] Martine's and Konrad's request that we take judicial notice of certain Colorado and federal cases and statutes is granted.

[6] It has been said that section 1913 of the Code of Civil Procedure is the California reflection of the full faith and credit clause of the United States Constitution by which "full faith and credit [must] be given in each state to the public acts, records, and judicial proceedings of every other state." (U.S. Const., art. IV, § 1; *Tyus v. Tyus* (1984) 160 Cal.App.3d 789, 792 [206 Cal.Rptr. 817].)

*law* shall file his petition therefore in the juvenile court . . . ." (Italics added.) "Upon the filing, by the person sought to be adopted, . . . of a consent to such adoption, . . . the prayer of the petition shall be granted, and a decree of adoption shall be rendered and entered by the court declaring such person *the heir at law of the petitioner and entitled to inherit from the petitioner* any property in all respects as if such adopted person had been the petitioner's child born in lawful wedlock . . . ." (Colo. Rev. Stats. § 14-1-101, subd. (2), italics added.)

Nothing in the Colorado statute, which authorizes the adoption of an adult as an "heir at law," suggests that an adoption decree, entered pursuant to the terms of the statute, creates any right or duty other than the right of the adopted person to inherit from the adopting person. As if the language of the statute were not sufficient to compel this conclusion, the Colorado Supreme Court made it plain in *Martin v. Cuellar* (1955) 131 Colo. 117 [279 P.2d 843]. "No obligation whatsoever is placed upon the person adopted with respect to the adoptive parent. He is granted no rights whatever, other than the acquisition of an heir at law, who may or may not even bear his name. *It is merely a means of giving effect to a personal transaction mutually agreeable between two adults.* No rights of the natural parents of the person adopted are taken from them, or even mentioned, where the purpose of the adoption is to acquire an adult 'heir at law.' " (*Id.* at p. 122, italics added.) By this reasoning, the *Martin* court concluded that the adoptive parent in an adult adoption under Colorado law did not acquire the status of "father" or "mother" as those terms are used in Colorado's wrongful death statute.

█ The status conferred by a Colorado adult "adoption" is that of "heir at law." Nothing more. Nothing less. Thus, although the adopted person gains the right to inherit from the adopting person, the adopting person does not gain such a right from the adopted person. And the "adoption" does not sever the parent-child relationship between the adopted person and his or her natural parents. The adopted person retains all the rights and duties as the child of the natural parents, including the right to inherit from them as their heir at law.

Thus, the status conferred by law upon the parties to an adult adoption under Colorado law differs markedly from the status conferred by law upon the parties to an adult adoption in California. As discussed, *ante,* an adult adoption in California confers upon the parties the status of parent and child, and severs the parent-child relationship with the natural parents. Conversely, the status conferred by an adult adoption in Colorado does not resemble a parent-child relationship—certainly not a parent-child relationship as Jacob is presumed to have contemplated under California law.

The cases decided by California courts are in accord with our view that the law of the state where the adoption took place must determine the status of the parties to the adoption. In *Estate of Hebert* (1941) 42 Cal.App.2d 664 [109 P.2d 729], although it was "not contended that the status of an adopted child under the laws of Washington is different from the status of a child adopted under the California law" (*id.* at p. 666), the court nevertheless stated the rule very clearly: "The *status* of an adopted child is determined by the laws of the state in which the adoption was effected, but the rules of inheritance as to personal property are to be determined by the laws of the state where the decedent was domiciled at the time of death and as to real property the rules of inheritance are to be determined by the laws of the state in which the realty is situated." (*Id.* at p. 665.)

In *Estate of Tibbetts* (1941) 48 Cal.App.2d 177 [119 P.2d 368], the court held that the adoption statutes of Massachusetts were material only for the purpose of determining whether the adopted person was a "lineal descendant" of the decedent, but finding the law of Massachusetts to be the same as California law with respect to the right of an adopted child to succeed to the property of the adopting parent, the California anti-lapse statute would be applied. Whether Massachusetts had an anti-lapse statute was held irrelevant.

In *Estate of Grace* (1948) 88 Cal.App.2d 956 [200 P.2d 189], the court needed to decide whether letters of administration should be issued to the decedent's niece Ruby (the daughter of decedent's predeceased brother), or to Grace, the daughter of decedent's adopted daughter Edna. (*Id.* at p. 957.) Grace's mother Edna had been adopted by the decedent in Texas, and the family later moved to California. At the time of the adoption, the Texas adoption statute did not distinguish between minors and adults, but was similar in some respects to the Colorado adoption statute here at issue. The Texas statute provided that " ' "Any person wishing to *adopt another as his legal heir* may do so by [following the specified procedure]." ' " (*Id.* at p. 958.) The Texas statute did not require any approval by the court. It required only that a statement be recorded in the official county records reciting that the adopting person adopts another as a legal heir. When recorded, the statement entitled " ' "*the party so adopted to all the rights and privileges*, both in law and equity, *of a legal heir of the party so adopting him . . . .*" ' " (*Ibid.*) The court characterized as "well settled" the proposition that the "status" or "capacity" of the adopted person must be determined in accordance with the law of the state where the adoption was effected, and thereafter the *right* of the person having that capacity to inherit would be determined under California law. Because Texas adoptions at that time did not confer upon the adopted person the full rights of a child, but only the

right to be an heir at law, the court held Grace's mother Edna had only the right to be decedent's heir at law, not her child, and for that reason, Grace had no right to inherit from the decedent.[7]

But, appellants argue, "A California court is not required by the Full Faith and Credit Clause to apply foreign law to determine the legal incidents arising in California from Steven's and Cynthia's status as adopted children." We have no quarrel with appellant's general proposition as stated. *Hebert, Grace,* and *Tibbetts* support that view as well. We disagree, however, with appellant's assumption that Steven and Cynthia are "adopted children." Under the Colorado law that created the legal relationship between them, Steven and Cynthia are Jacqueline's "heirs at law," not her "children." The existence of a parent-child relationship is the sine qua non for an adopted person to qualify as "issue" under California law. The simple incantation that a person was "adopted" does not suffice.

Appellants place great reliance on *Stanford, supra,* 49 Cal.2d 120, because the court treated an adult adopted under New York law the same as a child adopted in California. In particular, appellants select two sentences from the *Stanford* opinion, which state: "The effect of adoption under the New York law and construction of the will is not important. We are not here concerned with a question of inheritance but with the construction of a will, and whether 'child or children' includes adopted persons." (*Id.* at p. 142.) But the *Stanford* court was not called upon to distinguish the status created by a New York adoption from the status created by a California adoption. To the contrary, the adoption agreement approved by the New York court provided that " 'henceforth the [adopted persons, including one adult and one minor] shall be regarded and treated in all respects as the children of said [adopting person].' "[8] (*Id.* at p. 134.) We read these isolated sentences in the *Stanford*

---

[7] The court ultimately held in favor of Grace on the theory the statement of adoption recorded in Texas went beyond the terms of the adoption statute by offering full rights as a child to the adoptee, which offer was accepted by the child by living with the adopting parents as a member of the family. Thus, Grace's mother acquired full rights as the child of decedent as a matter of contract. (*Estate of Grace, supra,* 88 Cal.App.2d at pp. 962–967.) Here, the Colorado adoption decree, on its face, does not purport to create a parent-child relationship, (see fn. 8, *post*), and no other evidence of a contract was presented to the trial court.

[8] Appellants' contend the Colorado adoption decrees "confirm that Steven and Cynthia obtained the status of adopted children and should be treated like natural children." We disagree. The adoption decrees provide in relevant part: "Steven [and Cynthia] shall be . . . heir[s] at law of the Petitioner, Jacqueline Paley Greber, and entitled to inherit from and through said Jacqueline Paley Greber any and all property and in all respects and otherwise have all entitlements as if such adopted person[s] had been the natural child[ren] of Jacqueline Paley Greber." We read this language as granting to Steven and Cynthia "all entitlements" that a natural child would enjoy as Jacqueline's heir at law. To the extent the language of the decrees can be construed to grant a relationship or status to the parties that differs from the status authorized by the adult adoption statute, we note the court lacked the authority to do so

opinion to refer to the effect of an adoption under New York's law of inheritance, not to the legal relationship created by a New York adoption. Thus, as we understand *Stanford*, it is entirely consistent with all the California cases discussed in this opinion or brought to our attention by the parties.

■ Because Steven and Cynthia do not stand in relation to Jacqueline as children of a parent, but only as Jacqueline's heirs at law, we conclude they are not within the class of Jacqueline's "living lawful issue" under California law, and presumptively were not intended to be included in the class of Jacqueline's "living lawful issue" when Jacob executed those words in his 1954 trust. Had Jacob intended to distribute his wealth to a broader class, including those unilaterally designated by Jacqueline, he could easily have granted Jacqueline a testamentary power of appointment, as he did in his 1937 trust. Instead, Jacob included only those who qualified as Jacqueline's "issue," which we hold connotes a parent-child relationship, whether natural or adoptive. Because our decision on this point is dispositive, it is unnecessary to address other issues raised by the parties.

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

Rylaarsdam, J., concurred.

**SILLS, P. J.,** Concurring.—There is nothing wrong with the majority opinion; the result appears to be compelled by connecting the dots of precedent. I write separately, however, because today's result is actually quite anomalous and appears ultimately contrary to what the trustor probably wanted. It is only by the twist of this state's wholesale incorporation of other states' law as to the status of an adopted person—the sort of jack-in-the-box effect about which a trustor is likely to be blissfully unconcerned when deciding which state's laws should govern his trust—that we reach the result we do.

---

under Colorado law, as clearly appears from the language of the statute as confirmed by the Colorado Supreme Court in *Martin v. Cuellar, supra,* 131 Colo. 117 [279 P.2d 843]. "[T]he decree can speak only as to matters within the jurisdiction of the court, and where the court, in such a statutory proceeding attempts to determine matters beyond its competence, its decree, as to such matters, is not conclusive. 'If the court lacks jurisdiction to render, or exceeds its jurisdiction in rendering, the particular judgment in the particular case, such judgment is subject to collateral attack, even though the court had jurisdiction of the parties and of the subject-matter.' [Citation.] . . . [Citation.] And, to the extent a decree is beyond the authority of the court, it cannot be made valid by any rule of res judicata . . . ." (*West End Irr. Co. v. Garvey* (1947) 117 Colo. 109, 112–113 [184 P.2d 476, 478].)

Consider the almost ludicrous drafting problem the rule we apply today imposes. Suppose you were drafting Jacob Paley's trust and you wanted the California rule that treats adult adoptees as children for all purposes, not just heirship, to govern. (See, e.g., *Estate of Tibbetts* (1941) 48 Cal.App.2d 177, 178 [119 P.2d 368] ["Under the law of this state, there is no doubt that an adopted child is a 'lineal descendant' of the adopting parent . . . ."].)

You would probably think it would be sufficient to say, "this trust shall be construed according to the laws of the state of California." That would be elegant, logical, and alas, under the rule we apply today, wrong. You would practically have to do a triple axel to accomplish your task. You might have to write something like, "this trust shall be construed according to the laws of the state of California except to the degree that the rule under California law is to adopt another state's rule as to the status of adopted children, and in that instance the California rule of adopting another state's rule is not to govern, rather everything is to be decided as if it all happened in California regardless of whether it did or not." Or maybe something like, "use the California rule except where the California rule says to use another state's rule in which case forget *that* particular California rule and use the usual California rule."

The reader can get the drift: The most logical and natural inference of the trust language here is that the California substantive rule should be applied in the first instance, not the California rule that adopts another state's substantive rule. Jacob Paley may not exactly be turning over in his grave, but today's result can only disturb his peace.

Paley simply didn't reckon on the fine but confusing distinction between "status" of an adopted child and "rules of inheritance" on which today's result is predicated, in particular the idea that California law looks to the state where an adoption takes place to determine the "status" of an adopted child. *Estate of Grace* (1948) 88 Cal.App.2d 956 [200 P.2d 189] probably frames the idea as plainly as one is likely to find it: Whether someone has the "capacity" to "inherit personal property in California" is determined by the laws of the state where an adoption takes place. (*Id.* at p. 959.) Whether someone has the "right" to inherit is determined in California.

While the majority primarily cites *Estate of Hebert* (1941) 42 Cal.App.2d 664 [109 P.2d 729] and two other appellate cases for the rule, it ultimately traces back to *In re Williams* (1894) 102 Cal. 70 [36 P. 407]. Quoting from a Massachusetts case, our high court in *Williams* said that the status of an adopted child is fixed by another state's law, not our own. By "status" the court meant " 'the relation in which [an adopted child] stands to another person.' " (*Id.* at p. 82.) Such relationships are " 'fixed by the law of the domicile.' " (*Ibid.*) And " 'this *status* and capacity are to be recognized and upheld in every other

state, so far as they are not inconsistent with its own laws and policy.' " (*Ibid.,* quoting *Ross v. Ross* (1880) 129 Mass. 243.)

One must thus savor the irony of this case. A trustor who created a trust for an adopted daughter and specifically wanted that trust governed by California law which treated that daughter as his child for all purposes ends up having his trust governed by an 1880 Massachusetts rule adopted by our high court in 1894 which makes a Colorado rule determinative as to whether adults adopted by that adopted daughter can be beneficiaries.

There may be broader issues here as well. Consider the case of an elderly parent whose spouse has died, who has one adopted adult child, but adopted in another state. If this elderly parent is in serious need of some medical decision, and has no spouse or other relative except for the adopted (er, maybe) "child," the ability of the adopted child to make the necessary decision can be thrown into doubt. You have to do the research in another state's law and hope you get it right, but not only that—if the other state's rule is like Colorado's (or like Texas's before 1907, as explained in the *Grace* case)—this elderly parent ends up not really having a child when that particular child may be most needed.

Something is seriously wrong in today's result. Life expectancies have increased considerably since 1880; there are more elderly parents who have adopted children than ever. It may be time to reexamine *Williams*'s "use another state's rule" rule. That job, however, is not within the province of this court.

A petition for a rehearing was denied April 26, 2004, and the petition of appellant Animal Legal Defense Fund for review by the Supreme Court was denied July 21, 2004.