Filed 7/30/15

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MARY LOU SANDERS, as Trustee, etc.,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>JODY LYNN SANDERS YANEZ,<br><br>  Objector and Respondent. | H041578<br>(Monterey County<br>Super. Ct. No. MP21478) |

Appellant Mary Lou Sanders, cotrustee of the Marion C. Sanders Trust (the Trust), appeals from the probate court's order denying her petition and finding that her adopted son, Andrew J. Wallace, is not a beneficiary of the Trust. Mary is the income beneficiary of the Trust. The Trust provides that, upon Mary's death, Mary's "issue" will receive the Trust's assets, and it defines "issue" to include "adopted children." However, the probate court concluded that Andrew did not fall within this definition of "issue" because he had been adopted as an adult under Texas adoption statutes. The probate court believed that a Texas parent-child relationship did not encompass the same rights and duties as a California parent-child relationship. We conclude that the probate court's decision is not supported by the law. Hence, we reverse its order and remand with directions to grant Mary's petition.

## I. Background

Mary is the only child of the marriage of Marion C. Sanders and Herbert H. Sanders. Mary's half brother, George, is Herbert's son and Marion's stepson. Respondent Jody Lynn Sanders Yanez is George's eldest daughter.

In 1975, Marion executed a will prepared by a California attorney and executed in California. Marion's will placed most of her separate property assets in the Trust and provided that Mary would receive the income from the Trust during her lifetime. It further provided that, if Mary needed additional funds, the corporate cotrustee of the Trust, Bank of America, was authorized to provide her and "any issue" with payments from the principal of the Trust. Upon Mary's death, the remainder of the Trust's assets was to be distributed "for the benefit of the then living issue" of Mary.[1] The will provided: "The word 'issue' as used in this Will shall refer to lawful lineal descendants of all degrees and shall include legally adopted children." If Mary had "no living issue" surviving her, Jody was to become the income beneficiary of the Trust. Upon Jody's death, any remaining trust assets were to be used to establish a scholarship fund at San Jose State University in Herbert's name.

When Marion executed her will in 1975, Mary was 26 years old, living in Arizona, and intending to marry and move to Minnesota with her husband. Marion was aware of Mary's plans. Marion died in 1976. Herbert was the original cotrustee of the Trust; he died in 1988. Mary succeeded Herbert as the cotrustee of the Trust. Bank of America

---

[1] The Trust's assets were to be divided "into as many equal shares as there are grandchildren of mine then living and grandchildren of mine then deceased who have left lawful issue . . . ." "Each share set aside for a deceased grandchild shall be distributed to the then living lawful issue of such grandchild upon the principle of representation." Until each "grandchild" reached the age of 25, the assets were to remain in trust. Marion's will also provided that the trustee was authorized to make payments to the guardian of a "minor" beneficiary or to the "minor" directly.

resigned as cotrustee of the Trust at some point and was replaced with an attorney. In 2006, the Trust's assets apparently consisted of two condos in Texas. By the time this action was litigated, the Trust's assets apparently had dwindled to just a single condo valued at $160,000.

Andrew is the biological son of Mary's close friend, and Mary has known him since he was a child. In 2013, Mary, who resides in Texas, adopted Andrew, who was then an adult. The Texas adoption order provided that "Andrew J Wallace is henceforth the son of [Mary] for all purposes."

In 2014, Mary, as cotrustee of the Trust, filed a petition seeking a determination that Andrew was the successor beneficiary of the Trust. Jody opposed Mary's petition. Jody claimed that the Texas adoption did not make Andrew Mary's "issue" because a Texas adoption did not impose the same mutual parent-child obligations that exist under California law. She argued that Texas law does not require a parent to support an adult child and does not require a child to support a parent.

The court denied Mary's petition and found that Andrew did not qualify as Mary's "issue" under Marion's will. Although the court found "adopted children" was "not ambiguous on the face of the will," it found that there was a "latent ambiguity." The court acknowledged that "no extrinsic evidence was offered surrounding the circumstances of Testator executing her will" other than the fact that Mary was unmarried at that time.[2] It made its decision based solely on statutes, case law, and public policy. The court agreed with Mary that Marion's use of the words "adopted children" included adopted adults and that a Texas adoption of an adult "creates a parent-child relationship." However, the court found that a Texas adoption of an adult was not

_____

[2] George submitted a declaration in support of Jody's opposition stating that Marion had told him that she considered him her son and expected him to take care of her and Mary if Marion outlived Herbert. This declaration was not relevant to any of the issues before the probate court.

3

the equivalent of a California adoption of an adult because a Texas adult adoption "does not sever the relationship between the adopted adult and his or her biological parents as California law does" and "does not require an adult child to support a parent as California law does."[3] The court concluded that a Texas adult adoption "appears in substance to convey nothing more than heirship rights." The court found "that Testator did not intend the term 'issue' in her will to include adopted adults whose adoptive status lacked essential elements of what such status would entail under California law." Mary timely filed a notice of appeal.

## II. Discussion

"The interpretation of a written instrument, even though it involves what might properly be called questions of fact [citation], is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. [Citations.] Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible' [citations], and it is the instrument itself that must be given effect. [Citations.] It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.)

Mary contends that we should exercise independent review; Jody claims that our review is not independent because there was extrinsic evidence before the probate court in the form of declarations. The probate court expressly found that there was no extrinsic

---

[3] The court made this finding despite the fact that it was conceded by both parties below that, under Texas law, a Texas adult adoption severed the parent-child relationship between the adoptee and his or her natural parents.

4

evidence of Marion's intent, and its interpretation of Marion's 1975 will did not turn on the credibility of any extrinsic evidence. Hence, we exercise independent review.

Marion's will expressly included "adopted children" in the Trust's definition of "issue." As the probate court correctly noted, there was no ambiguity on the face of the will as to Marion's intent that Mary's "adopted children" would be considered Mary's "issue" for purposes of succeeding to the Trust's assets. The "latent ambiguity" identified by the probate court was what exactly Marion meant by "adopted children." The court looked to statutes, case authority, and public policy to resolve this latent ambiguity.

The probate court did not find that the fact that Andrew was adopted *as an adult* meant that he did not come within the meaning of "adopted children" in Marion's will. It found that Andrew did not come within the meaning of "adopted children" because his adoption under Texas law did not create a parent-child relationship that was the equivalent of the parent-child relationship that would have been created by a California adoption at the time of Marion's will and to which Marion was presumed to be referring.

"The *status* of an adopted child is determined by the laws of the state in which the adoption was effected . . . ." (*In re Estate of Hebert* (1941) 42 Cal.App.2d 664, 665.) Texas law provides that, upon adoption of an adult, "[t]he adopted adult is the son or daughter of the adoptive parents for all purposes," "is entitled to inherit from and through the adopted adult's adoptive parents as though the adopted adult were the biological child of the adoptive parents," and "may not inherit from or through the adult's biological parent[, and a] biological parent may not inherit from or through an adopted adult." (Tex. Fam. Code, § 162.507.) Texas case law unambiguously holds that "an adopted adult is '*for every purpose*, the child of his parent or parents by adoption as fully as though born of them in lawful wedlock.'" (*Lehman v. Corpus Christi Nat'l Bank* (Tex. 1984) 668 S.W.2d 687, 689, italics added.)

Despite the clarity of Texas law establishing that an adopted adult has the same status as the biological child of the adoptive parents "for all purposes," the probate court concluded that a Texas adult adoption established "nothing more than heirship rights." It based this conclusion on its belief that a Texas adult adoption "does not sever the relationship between the adopted adult and his or her biological parents as California law does" and "does not require an adult child to support a parent as California law does."

The probate court relied heavily on the Fourth District Court of Appeal's decision in *Ehrenclou v. MacDonald* (2004) 117 Cal.App.4th 364 (*Ehrenclou*). The trust in *Ehrenclou* was created in 1954. It provided that, upon the trustor's death, the trust's assets would be divided into separate trusts for the trustor's daughter and her "'children then living.'" The trustor's daughter would be an income beneficiary of her trust, and, upon her death, her trust's assets were to be distributed to "'her then living lawful issue per stirpes.'" (*Ehrenclou*, at p. 367.) When the trustor died, the daughter had two children then living. However, 32 years later, the daughter adopted two adults in Colorado. (*Ibid.*) When the daughter subsequently died, her two biological children petitioned the probate court for an order finding them to be the only "'living lawful issue . . . .'" (*Ibid.*) The probate court granted the petition. It found that "under the law of the State of Colorado 'adult adoption . . . create[s] in the adoptee only the status as heir at law to the person adopting, and such adoptee does not, by virtue of the adoption, become a "child" or "issue" of the person so adopting, and inheritance flows only through intestate succession of the adopting person and not as "issue" of such persons.'" (*Ehrenclou*, at p. 368.)

On appeal, the Fourth District acknowledged that it was bound by the principles set forth in *Newman v. Wells Fargo Bank* (1996) 14 Cal.4th 126 (*Newman*). In *Newman*, the California Supreme Court recognized that even ordinarily unambiguous terms such as "'issue'" or "children" may have latent ambiguities "in the context of a particular will and the circumstances in which the will was executed." (*Newman*, at p. 134.) "We

6

presume that provisions in a will are made with an understanding of, and an intent to act pursuant to, the law and public policy as it exists when the will is executed. It is more reasonable to assume that a testator who intends a different disposition will make express provision . . . than to assume that the testator intends that [the identity of the class members] not be established until some future time and be contingent upon legislative fiat." (*Newman*, at p. 140.) "The court will assume that the testator intended the will to be compatible with the law and public policy in effect at the time the will is executed and that, if the testator has a contrary intent, that intent will be made clear in the will." (*Newman*, at p. 142.) "We presume as we must that [the testator] knew the meaning of 'issue' and 'children' as those terms were understood at the time she executed the will." (*Ibid.*)

The word "issue" is not generally a legal or technical term of art.[4] It is, as the California Supreme Court acknowledged in *Newman*, a commonly understood word with no technical legal meaning. *Newman* held that the state of the law and public policy at the time a will drafted by an attorney was executed is *some* evidence of what was meant by a commonly understood word that has a latent ambiguity. Based on *Newman*, the Fourth District considered in *Ehrenclou* whether the trustor had intended to include the adults adopted in Colorado within the meaning of "issue."

"The 'relevant statutes, case law and public policy in effect at the time of the execution of the [trustor's 1954 trust]' [citation], included those 'embodied in the adoption statutes [citations] and in the succession statute providing for the inheritance rights of adopted children [citation].'" (*Ehrenclou*, *supra*, 117 Cal.App.4th at p. 370.) "[B]ecause an adopted person and the adopting person are, by [California] law, in a parent-child relationship the same as a natural parent and child, and presuming [the

---

[4]      The word "issue" was not statutorily defined in California in 1975. The word "issue" was first defined by statute in 1983. (Stats. 1983, ch. 842, § 21.)

7

trustor] intended his words to reflect California law, a person adopted under California law is 'lawful issue' of the adopting person as those words are used in the 1954 trust." (*Ehrenclou*, at p. 372.) The Fourth District observed that a California adoption creates a parent-child relationship that includes mutual support obligations between the adoptee and the parent, severs the parent-child relationship between the adopted person and his or her natural parents, and creates inheritance rights between the adopted person and the adoptive parent. (*Ehrenclou*, at p. 372.) The court stated that, "[u]nless the legal relationship between an adopted person and an adopting person embraces *all* of the mutual rights and duties of a parent and child [that are created under California law], it cannot be said that the adopted person is the 'issue' of the adopting person, at least insofar as that word is construed under California law." (*Ehrenclou*, at pp. 372-373, italics added.)

Turning to the Colorado statutes under which the adults had been adopted, the Fourth District determined that they did not have the requisite legal relationship to qualify as the "issue" of the adoptive parent. (*Ehrenclou*, *supra*, 117 Cal.App.4th at pp. 373-374.) The Colorado statutes in question did *not* create a parent-child relationship at all but merely functioned to create inheritance rights for an "adopted" adult. (*Ehrenclou*, at p. 374.) No other rights or obligations were created, and the natural parents' parental rights were not severed. (*Ehrenclou*, at p. 374.) Indeed, even the inheritance right was not mutual; the adoptive parent gained no right to inherit from the adopted person. (*Ehrenclou*, at p. 374.)

The *holding* in *Ehrenclou* does not dictate the result in this case. In *Ehrenclou*, the adults "adopted" in Colorado did not acquire a parent-child relationship with the daughter of the trustor because Colorado law provided that an adult adoption created only an heirship right. It was only in *dictum* that the Fourth District stated: "Unless the legal relationship between an adopted person and an adopting person embraces *all* of the mutual rights and duties of a parent and child [that are created under California law], it

8

cannot be said that the adopted person is the 'issue' of the adopting person, at least insofar as that word is construed under California law." (*Ehrenclou*, *supra*, 117 Cal.App.4th at pp. 372-373, italics added.) This is not necessarily correct. If the law of the state in which the adoption took place provides that the adoption creates a parent-child relationship "for all purposes," the adopted person acquires the same status as a biological child. The mere fact that a sister state where the adoption took place does not impose the same mutual rights and duties in parent-child relationships as California does is irrelevant unless the sister state defines the *adoptive* parent-child relationship differently from the *biological* parent-child relationship. California cannot devalue a parent-child relationship simply because it was created, whether by biology or adoption, in a sister state that imposes different rights and duties as parts of parent-child relationships subject to its jurisdiction. Those policy choices do not alter the status of the relationship.

It follows that the probate court's rationales fail to support its conclusion that Texas adult adoption laws do not create a parent-child relationship. Texas law unambiguously provides that a Texas adult adoption creates a parent-child relationship "for all purposes." Texas adult adoption laws *do* sever the parent-child relationship between the adopted adult and his or her biological parents because, by Texas statute, they lose their mutual inheritance rights. The precise parameters of the rights and duties imposed by Texas law on parents and children are not relevant to the determination of the status of an adopted person because those rights and duties apply to both biological children and adopted persons.

Accordingly, the probate court erred in ruling that Andrew was not Mary's "issue" within the meaning of Marion's 1975 will. Andrew's Texas adoption created a parent-child relationship between him and Mary. As Marion's 1975 will expressly included "adopted children" within its definition of "issue," Andrew qualifies as Mary's "issue."

9

### III.  Disposition

The probate court's order is reversed.  On remand, the court shall vacate its order denying the petition and enter a new order granting the petition.  Mary shall recover her appellate costs.

_____
Mihara, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P. J.

_____
Grover, J.

Sanders v. Yanez
H041578

11

Trial Court:                              Monterey County Superior Court


Trial Judge:                             Honorable Thomas W. Wills


Attorney for Plaintiff and Appellant:     Susan Wallace


Attorneys for Objector and Respondent:    Lisa J. Frisella
                                          Mara Christine Allard
                                          Law Office of Lisa J. Frisella


Sanders v. Yanez
H041578