Filed 9/26/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Estate of FUSAE OBATA, Deceased. | |
| KAZUKO UENAKA et al.,<br><br>Petitioners and Respondents,<br><br>v.<br><br>REIKO NAKANO et al.,<br><br>Objectors and Appellants. | A150284<br><br>(Alameda County<br>Super. Ct. No. RP13696569) |
| Estate of EMI OBATA, Deceased. | |
| KAZUKO UENAKA et al.,<br><br>Petitioners and Respondents,<br><br>v.<br><br>REIKO NAKANO et al.,<br><br>Objectors and Appellants. | A150285<br><br>(Alameda County<br>Super. Ct. No. RP13696574) |

The sole issue on appeal is whether California law recognizes the Japanese practice called 養子縁組 (*yōshi-engumi*) as an "adoption" within the meaning of California Probate Code sections 6450 and 6451.[1] We conclude that it does and, thus, we shall affirm the trial court's order granting respondents' petitions for entitlement to estate distribution.

**Factual and Procedural Background**

The decedents, Fusae Obata and Emi Obata, are sisters who in June 2013 died intestate, having never been married and with no descendants. In September 2013, letters

---

[1] All statutory references are to the Probate Code unless otherwise noted.

1

of administration of the two estates were issued in the Alameda County Superior Court. Thereafter, a dispute arose regarding the line of succession that centered on the decedents' father, Tomejiro Obata, and the impact of his *yōshi-engumi* by Minejiro Obata and Kiku Obata in 1911. Appellants are the descendants of Tomejiro's biological parents, Hikozaemon Nakano and Haru Nakano, and respondents are the descendants of the Obata family.[2]

Following a hearing in September 2016, the court found in favor of respondents, the Obata family members. The court concluded that California recognizes Tomejiro's *yōshi-engumi* as a legal adoption and that under the Probate Code, "The adoption of Tomejiro Obata by Minejiro Obata and Kiku Obata severed the relationship of parent and child between Tomejiro Obata and his natural parents, Hikozaemon Nakano and Haru Nakano."[3]

Appellants timely filed a notice of appeal.

**Discussion**

Under section 6450, "A relationship of parent and child exists for the purpose of determining intestate succession by, through, or from a person in the following circumstances: [¶] (a) The relationship of parent and child exists between a person and the person's natural parents, regardless of the marital status of the natural parents. [¶] (b) The relationship of parent and child exists between an adopted person and the person's adopting parent or parents." Under section 6451, subdivision (a), "An adoption severs the relationship of parent and child between an adopted person and a natural parent of the

---

[2] This is an oversimplification of the parties' lineage as there were inter-marriages between the two families. For purposes of this appeal, however, the description is sufficient.

[3] The parties devote considerable briefing to the impact of a second *yōshi-engumi* within respondents' lineage and whether it rendered Tomezo Shimizu the adoptive brother of Tomejiro Obata. Having determined that Tomejiro's adoption should be recognized in California, we need not reach the arguments regarding the second adoption. The number of heirs is unchanged whether respondents trace their lineage through Tomezo or his sister/wife Kumano Shimizu.

adopted person unless both of the following requirements are satisfied: [¶] (1) The natural parent and the adopted person lived together at any time as parent and child, or the natural parent was married to or cohabiting with the other natural parent at the time the person was conceived and died before the person's birth. [¶] (2) The adoption was by the spouse of either of the natural parents or after the death of either of the natural parents."

Appellants challenge the trial court's conclusion that the adoption of decedents' father in Japan in 1911 severed his relationship with his biological parents thereby precluding intestate inheritance by the descendants of his biological parents. "Under rules of conflict of laws and principles of comity, the status of adoption is determined by the laws of the jurisdiction where the adoption was effected, and the rules of inheritance are determined by the laws of the jurisdiction of domicile of the decedent at time of death." (*Estate of O'Dea* (1973) 29 Cal.App.3d 759, 774; see also *Estate of Grace* (1948) 88 Cal.App.2d 956, 961-962 ["a child adopted in another state, who obtains the status of a child of the adopter (as distinguished from a legal heir), inherits in California under our laws of succession"].) A person's status as an adoptive child is determined as of the date of adoption. (*Estate of Summer* (1942) 51 Cal.App.2d 39, 42.)

"In Japan the concept of adoption or *yoshi* has a much wider meaning than in modern western nations." (O'Halloran, The Politics of Adoption: International Perspectives on Law, Policy and Practice (3d ed. 2015) p. 639 (hereafter O'Halloran).)[4] Adoption, as it existed in 1911, must be understood in the context of Japanese family structures. (*Ibid.* ["To get a sense of what adoption means in a Japanese context it is first necessary to consider the cultural significance of 'family', the importance of 'ancestor worship' and the support role provided by 'adult adoption'."].) Historically, "the extended family or 'house' (*ie*) formed Japan's smallest social unit, usually comprising three generations of one family. Japanese social anthropoglots Ariga Kizaemon described

---

[4] O'Halloran's book is volume 41 of the IUS Gentium: Comparative Perspectives on Law and Justice series of books. The Westlaw citation for the relevant chapter is 41 IUS Gentium 637.

this institution as follows: A 'house' is being considered existing uninterruptedly from the past into the future, irrespective of the birth or death of its members. The ancestors and the descendants are mutually linked by the idea of family genealogy, which is not understood as a relation merely based on blood lineage and succession, but rather as a number of relations, which are necessary for the maintenance and continuation of the 'house' as an institution. On top of the 'house' stood the head of the 'house', endowed with vast powers and authority, and all rights belonging to the head of the 'house' such as the continuation of the name of the 'house', the administration of the 'house'alter and the seal of the 'house', passed on to his designated successor. Even when a 'house' had no sons, but daughters and the head of the 'house's' wife was alive, it was considered not to have an heir, for upon marriage daughters usually entered their new spouse's 'house'. If no heir existed, the 'house' faced the threat of extinction. To prevent such a disastrous event, it was quite customary for an heirless 'house' to adopt a successor." (Schmidt, History of Law in Japan since 1868 (Röhl edit., 2005) pp. 262-263, fns. omitted (hereafter Schmidt).)[5] "In terms of relations, the adoptee became a member of its adoptive father's 'house' upon effectuation of an adoption, and the same blood kinship as between the adoptive parents and their relatives existed between the adoptive parents and the adopted child." (*Id.* at p. 276.)

The first Japanese Civil Code (*Meiji* Civil Code), enacted in the 1890s, incorporated provisions relating to the historical practice of *yōshi-engumi.* Under article 860 of the *Meiji* Civil Code,[6] "An adopted child acquires the status of a child in wedlock of his/her adopted parent(s) from the time of adoption." Although the statute uses "adopted child," it was clearly intended to encompass adult adoptions. Adoption in Japan "has never been particularly concerned with either providing children for infertile couples nor with finding homes for children in need." (O'Halloran, *supra*, p. 639.) To this day,

---

[5] The book is volume 12 of the Handbook of Oriental Studies.

[6] Appellants do not dispute that exhibit A to respondents' petition in the trial court contains a correct copy of the relevant statutes and their English translations.

Japan still has "a very high rate of legal adoptions of which only a small minority relate to children." (*Id*. at p. 640.) The statutes also defined "family" as the members of a house other than the head of the house. (Schmidt, *supra*, p. 283, citing *Meiji* Civil Code, art. 732.)[7]

Under the Household Register Law of May 1871, "legal registries" were compiled for all households in a district. (Schmidt, *supra*, p. 268.) "From 1875 on, an adoption was only effected upon registration in the household register." (*Id.* at p. 276.)

Appellants contend the trial court erred in recognizing *yōshi-engumi* as an adoption because the practice does not "satisfy the elemental characteristics of adoption recognized in California and the Western/American context." Specifically, they argue (1) *yōshi-engumi* does not create a sufficient parent/child relationship between the adoptee and adopting parents; (2) it does not terminate the parent/child relationship between the adoptee and the adoptee's biological parents; (3) it does not require a judicial or neutral third party review process that ensures the legitimacy of the adoption; and (4) it does not result in a permeant relationship. We disagree.

In *Sanders v. Yanez* (2015) 238 Cal.App.4th 1466, 1474, the court held, "If the law of the state in which the adoption took place provides that the adoption creates a parent-child relationship 'for all purposes,' the adopted person acquires the same status as a biological child. The mere fact that a sister state where the adoption took place does not impose the same mutual rights and duties in parent-child relationships as California does

---

[7] Subsequent amendments to the *Minpo*, or Civil Code of Japan, modified the laws regarding adoption separating *futsu yōshi-engumi* or "ordinary adoption" which most often involved adult adoptions from *tokubetsu yōshi-engumi* or "special adoption" which involved the adoption of children only. (O'Halloran, *supra*, p. 638 ["While the Civil Code continues to govern adoption and other family law matters, it was completely revised in 1947 and is now totally different from the Civil Code of 1898."].) These amendments undoubtedly reflect changing cultural norms in Japan. For purposes of this appeal, however, we focus on the laws in effect at the time of the adoption in 1911. Likewise, the fact that the United States Department of State currently recognizes only "special adoption" for purposes of immigration to the United States does not alter the parent-child relationship established by the *yōshi-engumi* in 1911.

is irrelevant unless the sister state defines the *adoptive* parent-child relationship differently from the *biological* parent-child relationship. California cannot devalue a parent-child relationship simply because it was created, whether by biology or adoption, in a sister state that imposes different rights and duties as parts of parent-child relationships subject to its jurisdiction. Those policy choices do not alter the status of the relationship."

Here, while the primary purpose of the adoption may have been to create an heir, the role of an heir in Japanese society at the time of the adoption was considerably more expansive than what under California law we consider the role or status of an heir. Being an heir involved not just inheritance rights, but financial and moral obligations to care for relatives and honor the family's ancestors. (O'Halloran, *supra*, p. 641 ["The adoption of a son-in-law continues its historical legal and social functions of providing an heir to carry on the family line, its business, its ancestor worship duties and to undertake care responsibility for elderly parents (the latter being an attraction for many elderly persons as it brought with it an assurance that care responsibility would fall to their daughter rather than their daughter-in-law)." (Fns. omitted.)].) Accordingly, both culturally and under the terms of the statute, the adopted person is considered a biological child for all purposes.

The additional elements proposed by appellants are neither required by California law nor sufficient to defeat Tomejiro's status as an adopted child. Whether Tomejiro's adoption would have terminated his relationship with his biological parents under Japanese law now or in 1911 is largely immaterial. As noted above, the rules of inheritance are determined by the laws of the jurisdiction of domicile of the decedent at time of death. More importantly, even assuming that in 1911 an adopted person might have maintained some ongoing relationship with that person's biological family, that relationship does not necessarily alter the status or character of his relationship with his adopted family. Likewise, judicial approval and permeance are not determinative characteristics of a valid adoption. Adoptions that were recorded in the family registry, as Tomejiro's was, were undisputedly considered "legal" and enforceable under Japanese

6

law. And, the potential lack of permanency of the relationship does not impact the status of the relationship while it exists.[8]

For purposes of intestate succession, under California law, the 1911 adoption severed the relationship between decedents' father and his natural parents. (§§ 6450, 6451, subd. (a).) Accordingly, the court properly granted respondent's petition.

### Disposition

The order determining entitlement to estate distribution is affirmed. Respondents shall recover their costs on appeal.

Pollak, Acting P.J.

We concur:

Jenkins, J.
Ross, J.[*]

---

[8] We note that adult adoptions in California do not necessarily meet all of appellants' proposed requirements. For example, an adopted adult, in some instances, retains the right to inherit from that person's biological parent and can dissolve the adoption by consent of the parties. (§ 6451; Fam. Code, §§ 9306, 9320, 9340.)

[*] Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

7

Trial court:                                    Superior Court of Alameda County

Trial judge:                                    Honorable Thomas M. Reardon

Counsel for objectors and appellants:           Law Offices of Connie Yi PC
                                                Connie J. Yi
                                                Bobby Y. Lydon-Lam

Counsel for petitioners and respondents:        Witherspoon & Siracusa
                                                Andrew K. Schultz

                                                Law Offices of Daniel A. Conrad
                                                Daniel A. Conrad

A150284, A150285