Filed 9/13/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ELIZABETH LEVIN, | |
| Plaintiff and Appellant, | G056353 |
| v. | (Super. Ct. No. 30-2017-00912251) |
| DEBRA WINSTON-LEVIN, Individually and as Trustee, etc., | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Jacki C. Brown, Judge. Affirmed.

Lurie, Zepeda, Schmalz, Hogan & Martin and Troy L. Martin for Plaintiff and Appellant.

Hart | King, William R. Hart, Andrew C. Kienle, and Rhonda H. Mehlman for Defendant and Respondent.

\* \* \*

In 1986, Robert Levin established a revocable trust named, quite simply, the Robert Levin Trust (the Levin Trust). The Levin Trust was thereafter amended several times: in 1993, 2002, 2005, 2006, 2008, 2011 and 2012. After Robert passed away in 2015, litigation erupted, principally over the 2008 and 2012 amendments to the Levin Trust. Elizabeth Levin, Robert's daughter from a prior marriage, sued Robert's widow, Debra Winston-Levin, on multiple grounds which, by the time the matter went to trial, had devolved into causes of action for an order compelling the return of certain Levin Trust property pursuant to Probate Code section 850, and for double damages pursuant to Probate Code section 859.[1]

The Levin Trust had twice been amended to benefit Robert's current wife, Debra, at the expense of his daughter Elizabeth. The first amendment, in 2008, was at the outset of Robert's declining mental condition; the second amendment, in 2012, was well into that decline. The court found Debra had not exerted undue influence as to the 2008 amendment. As to the 2012 amendment, however, the court found a presumption of undue influence went unrebutted by Debra. As a result, the court voided the entire 2012 amendment and ordered Debra to return property she had obtained pursuant to the 2012 amendment and a related deed.

Debra, however, did not appeal; Elizabeth did. Elizabeth contends the court erred in three ways. First, she argues the court's finding of undue influence compelled a finding that Debra was liable for financial abuse of an elder, which, in turn, compels an award of double damages under Probate Code section 859. Her argument raises a close question of statutory interpretation, but we ultimately disagree, concluding the court correctly interpreted that section to apply only where the undue influence was exerted in bad faith, which the court declined to find. Second, Elizabeth contends the

---

[1] We will refer to the parties throughout this opinion by their first names to avoid confusion; all parties involved share the surname Levin in one form or another. No disrespect is intended.

2

evidence compelled a finding that undue influence tainted the 2008 amendment as well. We disagree; the court's ruling was supported by substantial evidence. Finally, Elizabeth contends the court erred in voiding the entire 2012 amendment rather than carving out only those portions that benefited Debra. We conclude otherwise, finding that a reasonable inference from the cumulative changes in the amendment are that they were intended to be intertwined, such that voiding only those portions benefiting Debra would not effectuate Robert's intent. Accordingly, we affirm the judgment.

FACTS

*History of the Levin Trust Amendments*

Debra was Robert's wife for the last 20 years of his life. Elizabeth is Robert's only child from a prior marriage, an adult whom he supported financially between 1985 and 2012.

Robert purchased residential property on Balboa Island in 1987, which was after divorcing Elizabeth's mother, but before meeting Debra. The court described the property as "his dream, which he renovated to his taste and specifications." He married Debra in 1992. In 1993, Robert quitclaimed the Balboa Island property to another trust he had established named the Robert Levin Personal Residence Trust (Residential Trust). Around the same time, he restated the Levin Trust to grant Debra a life estate in the net income of the trust upon Robert's death, as well as principal, as needed, to support her standard of living. Upon Debra's death, the res of the Levin Trust would flow into a trust created for Elizabeth.

In 2002, the Levin Trust was amended and restated along similar lines to the 1993 restatement. However, the 2002 amendment clarified that the trustee could withhold distributions to Elizabeth if her level of financial responsibility, her mental

3

condition, or any use of drugs would adversely affect her ability to manage the funds to be distributed.

In 2005, Robert amended the Levin Trust to make Debra the first successor trustee.

In 2006, Robert executed a codicil to his will in which he elected to distribute property, which was subject to his power of appointment in the Residential Trust, to a trust created for Debra upon his death under the terms of the Levin Trust. Under the 2002 amendment to the Levin Trust, the effect of this election was that Debra would be free to reside in the Balboa Island house rent free for the remainder of her life.

In January 2008, Robert underwent an MRI brain scan because he was experiencing memory loss. A doctor found "mild atrophy" in the brain, but noted Robert was "alert and oriented. Memory and abstracting ability were normal." In September 2008, Robert underwent a major surgical operation on his back.

Robert amended the Levin Trust again in December 2008—this amendment is a focus of the present appeal. The most significant change was that, upon Robert's death, the residence was to be distributed to Debra "outright and free of trust." Debra was present at the meeting between Robert and his attorney that led to this amendment.

In April 2009, Robert's doctor wrote a letter indicating Robert's mental condition was beginning to deteriorate. After summarizing Robert's recent history, the doctor stated, "[Robert's] wife is now complaining that he is becoming progressively more forgetful and he is losing executive function and can't make decisions, and is sometimes irritable. He is excessively drowsy and sleeps 12 hours or more a day." The doctor examined Robert and found him to have "normal speech. He is cooperative and alert. He is able to name objects and repeat phrases. On the Mini Mental Status Examination he scored 29 out of 30, short-term memory being a bit poor." The doctor concluded Robert had "mild cognitive impairment."

4

In November 2011, Robert amended the Levin Trust again to name Debra as co-trustee of the trust. Debra testified he did this because he was thinking of the future and cognizant of his advancing age and declining physical condition. Prior to amending his trust, his attorney urged him to obtain a letter from his doctor affirming Robert's capacity to make financial decisions. In response, Robert's neurologist penned the following letter: "Robert Levin has been a friend of mine for 20 years plus and I have advised him occasionally on medical issues. Based on my frequent interaction with him, it is my opinion that he is capable of taking care of his own affairs including financial decisions." Another doctor who was treating Robert "for a mild stage of probable Alzheimer's disease" wrote, "In considering Mr. Levin's current capacity of executive functioning, it is clear that he still has the ability to handle his own estate planning decisions and affairs. Moreover, he maintains the ability to conduct and manage his own finances at the present time."

In February 2012, Robert's mental condition was assessed by a different doctor. He had been referred by Debra "in order to evaluate changes in cognitive and mood symptoms." Robert had "reported lapses in short-term memory and mood symptoms, which he described as 'stubbornness.'" Debra further reported that she was having to take over certain daily tasks for Robert. For example, she managed his medications, selected his clothes and reminded him when to change them. Debra reported that if Robert's meal was interrupted with a phone call, afterward he would forget that he had been eating. Debra also complained that Robert had recently started making impulsive financial decisions, such as opening and closing bank accounts, and that his driving was becoming dangerous. Both Debra and Robert said his mental condition declined after his back surgery. Debra also noted that he was "unofficially diagnosed with dementia of the Alzheimer's type by a research assistant but no formal assessment was done." That resulted in Robert taking an experimental drug for dementia. As part of the assessment, Robert described his family relations. He described his

5

relationship to Elizabeth as "strained with minimal communication." "He also reported that his daughter has caused some emotional strain in his marriage." After performing a series of tests, the doctor concluded his condition was "most consistent with a diagnosis of mild Vascular Dementia."

Approximately three months later, in May 2012, Robert resigned as trustee of the Levin Trust, leaving Debra as the sole trustee.

In July 2012, Robert again restated and amended the Levin Trust. This is the amendment the court ultimately voided.[2] This amendment contained four changes relevant here. First, upon Robert's death, Debra was to receive a lump sum payment of $2 million, together with lifetime support from the net income of the trust and partial distributions of the principal. Also, the restated trust no longer would give the residence to Debra outright and free of trust. Instead, 11 days later, Robert simply quitclaimed the residence to Debra. Third, the residue of the estate, following the death of Debra, would go 90 percent to Elizabeth. This differed from the 2008 amendment, in which, following the death of Debra, Elizabeth was given a life estate in the income of the trust, but in which the entire residue after Elizabeth's death was given to Shriners Temples of North America. Finally, Debra was to continue as trustee during Robert's lifetime, but after his death another person was nominated as trustee.

The attorney who drafted the 2012 amendment testified at trial that Robert seemed "as competent as any client that I have ever talked to." The attorney explained Robert's reasoning for the change: "Mr. Levin was very concerned about Debra being, basically, harassed and dragged into court by his daughter, Elizabeth, after Robert had passed away. And so what he wanted to do was change his trust around a little bit so that

---

[2]      In response to Elizabeth's objections to the statement of decision, the court replaced the word "voided" with "disregarded." It is not clear to us why the court made that change, or that there is any relevant legal distinction to be drawn between "voided" and "disregarded."

6

there would be a third-party trustee, not Debra, dealing with the trust after Robert's death, number 1, and he wanted to, number two, make sure that Debra at least had secured the home that they lived in with a minimum of conflict and contact with his daughter."

As a result of Robert's declining mental and physical condition, he was moved into an assisted living home in June 2013. He ultimately passed away in 2015.

*Trial and Ruling*

Elizabeth filed the underlying petition in April 2017. Her first amended petition asserted causes of action for an order compelling the return of trust property pursuant to Probate Code section 850, double damages pursuant to Probate Code section 859, breach of contract or trust, "intentional interference with expected inheritance", breach of fiduciary duty, and financial elder abuse. By the time the parties went to trial, Elizabeth was asserting only the first two claims.

The testimony at trial devolved into a tit-for-tat matchup between Debra and Elizabeth. Both attempted to beautify themselves and vilify the other. And both brought in third-party witnesses to corroborate their version of the story. As the court summarized in its statement of decision, "Both Elizabeth and Debra testified, as did Cheryl Campbell-Lane [the family masseuse] and Dr. Trader [an expert testifying about Robert's mental state] for Elizabeth, and Judy Craighton, Daniel Montano [long-time friends of Robert's] and Brian Mandel [an estate planning attorney] for Debra. From these two, diametrically opposed sets of witnesses, two descriptions of Robert Levin emerged: (1) A man who intentionally defrauded his only child of her inheritance from her grandfather, but who adored that daughter and always intended to fully provide for her, in part *because* he had robbed her of his father's legacy. This man then remarried a woman who hated Elizabeth from the very start, requiring him to 'sneak around' behind his new wife's back to visit with his daughter. This characterization was supported by Campbell-Lane, a masseuse who testified as to statements by both Robert and Debra

7

displaying exactly the picture Elizabeth portrayed, including that Debra intended or threatened to divorce Robert if he did not transfer the Balboa Island home into her name; and (2) A very successful and generous man with the proverbial 'albatross around his neck' in the form of a whining, demanding daughter who was never able to support herself. He was totally in love with Debra, with whom he had a perfectly happy marriage, except for the drain caused by Elizabeth's constant harangues for more money. This characterization was supported by Judy Craighton and Daniel Montano."

The court was, to say the least, not impressed with either side: "Both Elizabeth and Debra lacked credibility as witnesses; both made denials clearly refuted by other evidence in the record. Both were difficult personalities, yet they shared one common characteristic: They preferred to manipulate the man who held the purse-strings instead of standing on their own two feet, financially and psychologically. Individually, each understood Levin to be loving and generous with her, while depicting him as distanced from, and distrusting of the other. The reality undoubtedly was that Robert loved them both, and, preferring to minimize conflict, pursued his relationship with each one of them separately, as best he could." (Fn. omitted.)

The court ultimately hewed a middle ground between Debra's and Elizabeth's positions. It found that the circumstances of the 2012 amendment triggered a presumption of undue influence, which Debra failed to rebut. However, the court found that the mild cognitive decline Robert was suffering in 2008, and the less drastic changes to his estate, were insufficient to trigger the same presumption as to the 2008 amendment. The court ordered that the residence be returned to the Levin Trust as restated and amended in 2008 and disregarded the 2011 and 2012 amendments to the trust.

The court also rejected Elizabeth's claim for double damages under Probate Code section 859. The court reasoned that section 859 "provides for extreme compensation when the negative conduct is greater than that which is necessary to

8

accomplish the bad act. It is the egregiousness of the conduct that triggers the penalty. The Court does not find it in this scenario." Elizabeth appealed. Debra did not.

DISCUSSION

Elizabeth raises three issues on appeal. First, she contends the court's finding of undue influence as to the 2012 amendment compelled a finding that Debra committed financial elder abuse, which, in turn, compelled an award of double damages (i.e., return of the residence, plus a payment of $4 million (the value of the residence)) under Probate Code section 859.[3] Second, she contends the evidence compelled a finding of undue influence as to the 2008 amendment. Finally, she contends the court's order disregarding the entire 2012 amendment was overbroad; the court should have simply excised the provisions resulting from undue influence.

*Absent a Finding of Bad Faith, Double Damages Under Probate Code Section 859 May Not be Awarded Based on an Undue Influence Theory of Elder Abuse*

Elizabeth contends the court erred in interpreting Probate Code section 859 to require some form of egregious conduct to warrant double damages. Her argument that Debra is liable for double damages traces a route through three different statutes: Probate Code section 859, Welfare and Institutions Code sections 15610.30, and 15610.70. We interpret them de novo. (*Estate of Stoddart* (2004) 115 Cal.App.4th 1118, 1126-1127.)

Probate Code section 859 provides for an award of double damages under three circumstances: "If a court finds that a person has in bad faith wrongfully taken . . . property belonging to a conservatee, a minor, an elder, a dependent adult, a trust, or the

---

[3] The evidence of the value of the residence was Debra's testimony that her "general idea" was that the residence was worth "probably 4 million."

estate of a decedent, *or* has taken . . . the property by the use of undue influence in bad faith *or* through the commission of elder or dependent adult financial abuse, as defined in Section 15610.30 of the Welfare and Institutions Code, the person shall be liable for twice the value of the property recovered by an action under this part." (Italics and bold added for clarity.)

Elizabeth relies on the third prong in Probate Code section 859, contending Debra committed financial abuse of an elder as defined in Welfare and Institutions Code section 15610.30. That section describes three types of financial abuse of an elder: (1) taking real or personal property of an elder "for a wrongful use or with intent to defraud"; (2) assisting in the same; and (3) taking "real or personal property of an elder . . . by undue influence, as defined in [Welfare and Institutions Code] Section 15610.70." (*Id.*, subd. (a)(1)-(3).) Elizabeth contends she proved the third type of financial elder abuse.

Welfare and Institutions Code section 15610.70, in turn, defines undue influence as "excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." (*Id.*, subd. (a).) In determining whether undue influence was used, the statute directs a court to consider four factors: (1) the vulnerability of the victim (*Id.*, subd. (a)(1)); (2) the influencer's apparent authority, which may be evidenced by a fiduciary or family relationship (*Id.*, subd. (a)(2)); (3) the actions or tactics used by the influencer, which may include controlling the victim's life, use of affection or coercion, or initiating changes in an estate plan, particularly where haste or secrecy is used (*Id.*, subd. (a)(3)); and (4) the equity of the result, which accounts for economic consequences to the victim, divergence from prior estate plans, and "the appropriateness of the change in light of the length and nature of the relationship" (*id.*, subd. (a)(4)).

In its statement of decision, the court made findings on each of these four factors: (1) "[T]he evidence of his medical and cognitive decline paints a picture of a

10

dependent personality . . . ." "By 2012, he was completely dependent on Debra and fearful that she might leave him which would directly affect his survival possibilities"; (2) Debra "was a family member *and* the primary confidante, advisor and medication supervisor to [Robert], at least after 2008"; (3) "According to Campbell-Lane, Debra actually talked about leaving [Robert] if he failed to turn over the house to her, a tactic that would have been overwhelmingly devastating to a man whose life and self-sufficiency was draining away"; and (4) "[T]he equity of the estate changes and title transfers of July 2012 was entirely of a substantial benefit to Debra."

From these findings, Elizabeth draws a straight line to double damages: the findings equate to undue influence (Welf. & Inst. Code, § 15610.70); undue influence is a form of elder financial abuse (Welf. & Inst. Code, § 15610.30, subd. (a)(3)); proving financial elder abuse entitles her to double damages (Probate Code, § 859). No bad faith or egregiousness is required.

While there is certainly appeal in Elizabeth's straightforward reading of the statutes, the result—double damages for undue influence even without bad faith—is at odds with the text of Probate Code section 859. That section provides double damages in three scenarios: (1) "wrongfully" taking property "in bad faith"; (2) taking property through undue influence "*in bad faith*"; or (3) financial abuse of an elder/dependent adult. (Italics added.) Here, the type of financial abuse of an elder relied upon by Debra to satisfy the third scenario for an award of double damages was the type specified in Welfare and Institutions Code section 15610.30, subdivision (a)(3). But that provision mirrors the second scenario for the award of double damages under Probate Code section 859—i.e., the taking of property through undue influence. If we were to interpret the third scenario under Probate Code section 859 as allowing for double damages any time undue influence is proved, even without bad faith, the second scenario would essentially become surplusage—the requirement of bad faith would be read out of the statute. We do not believe the Legislature intended that result.

11

In interpreting a statute, we begin with its words. "If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . ." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) "But the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.] Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." (*Ibid.*) Our high court has repeatedly stressed that "interpretations that render statutory terms meaningless as surplusage are to be avoided." (*People v. Hudson* (2006) 38 Cal.4th 1002, 1010.)

We do not believe the Legislature intended to provide double damages for undue influence *without* bad faith for several reasons. First, it said so: "by the use of undue influence *in bad faith*." (Prob. Code, § 859, italics added.)

Second, there is nothing in the legislative history of Probate Code section 859 to suggest the Legislature intended to create two different standards for penalizing undue influence. Prior to 2012, section 859 did not explicitly apply to either undue influence or elder abuse; it simply stated, "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to the estate of a decedent, conservatee, minor, or trust, the person shall be liable for twice the value of the property recovered by an action under this part." (Stats. 2001, ch. 49, § 1.) The 2012 amendment added the language about undue influence in bad faith or elder/dependent adult financial abuse. What motivated the amendment was an unpublished Court of Appeal decision that refused to apply former Probate Code section 859 to a case of undue

12

influence *with* bad faith *on an elder*. As the author of the bill explained, "Although there are no reported cases interpreting this provision, there has been at least one unpublished appellate opinion . . . that holds that the bad faith action of an individual, using undue influence on an elderly parent, is not sufficient to allow a trial court to award double damages. [¶] If the appellate court's view is embraced in other cases, it would threaten to undercut the broad protections the Legislature has consistently intended by enacting a series of statutes dating back to 1851 to put potential wrongdoers on notice of their exposure to double liability for bad faith taking of estate property in all trust, guardianship, and conservatorship cases." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 354 (2011-2012 Reg. Sess.) at p. 2.) The point of the amendment, therefore, was not to create a penalty for undue influence *without* bad faith, but instead to ensure that instances of undue influence *with* bad faith *on an elder* were appropriately punished.

Third, a double standard makes little sense in the context of the statute. Probate Code section 859 applies to property taken from "a conservatee, a minor, an elder, a dependent adult, a trust, or the estate of a decedent." Most of these categories are encompassed in the categories of "elder" or "dependent adult"; only minors would be categorically excluded.[4] If there were truly a double standard, therefore, the vast majority of applications of Probate Code section 859 would be governed *not* by the undue influence standard explicitly set forth in the statute, but instead by a watered down version buried under three statutes, each of which contains multiple branching paths. We cannot believe the Legislature intended the statute to be read that way.

---

[4] "'Dependent adult' means a person, regardless of whether the person lives independently, between the ages of 18 and 64 years who resides in this state and who has physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights, including, but not limited to, persons who have physical or developmental disabilities, or whose physical or mental abilities have diminished because of age." (Welf. & Inst. Code, § 15610.23, subd. (a).)

13

Also on the topic of context:  this is a penalty statute with a common theme of bad faith.  The first two branches of Probate Code section 859 explicitly require a finding of bad faith.  And financial elder abuse, which itself connotes a sense of bad faith, likewise has three branches, the first two of which have a form of bad faith requirement ("for a wrongful use or with intent to defraud").  (Welf. & Inst. Code, § 15610.30, subds. (a)(1), (2).)  It would be out of step with the gestalt of the statute to impose a penalty in a case where there was no bad faith.

And not all instances of undue influence entail bad faith.  Undue influence is defined in terms of "excessive persuasion" (Welf. & Inst. Code, § 15610.70, subd. (a)), but what is excessive under the circumstances may not always be obvious.  A loved one's slow, inexorable mental decline toward incompetency has no obvious signpost to delineate the exact point where negotiations about the disposition of assets become overbearing.  Courts often make determinations of undue influence with the benefit of hindsight and expert testimony.  But as the tragedy of a loved one's deterioration is unfolding, it may not be clear.  Here, for example, the evidence supporting the court's finding of no bad faith showed that, at the time of the 2012 trust amendment, Debra had recently obtained two medical opinions affirming Robert's competency, the attorney who performed the estate planning perceived no mental incompetence, and the actual changes were on a trajectory consistent with Robert's prior estate plan changes—more for his wife of 20 years, Debra, and less for Elizabeth.  This was a close case, not a case warranting a $4 million punishment.

These considerations highlight a fourth reason to reject Elizabeth's position that all undue influence compels double damages:  such a rule could create a chilling effect on the willingness of trial courts to find undue influence.  Welfare and Institutions Code section 15610.70 explicitly requires courts to take "[t]he equity of the result" into account in analyzing an undue influence claim.  (*Id.*, subd. (a)(4).)  In close cases, a court may conclude that an equitable result becomes decidedly inequitable once double

14

damages are accounted for, and thereby decline to find undue influence where it otherwise would have. It would be a perversely ironic outcome if the statute meant to punish undue influence resulted in undue influence going unchecked. We deem it important that trial courts maintain the flexibility to assess undue influence without being compelled to impose double damages in every case.

Accordingly, we hold that under Probate Code section 859 a party seeking double damages on a theory of undue influence must prove bad faith. In reaching this result, we distinguish two cases that contain language seemingly at odds with our conclusion.

The first is *Hill v. Superior Court* (2016) 244 Cal.App.4th 1281 (*Hill*). There, the petitioners alleged their stepfather had wrongfully concealed property in their mother's estate, entitling them to double damages under Probate Code section 859. The stepfather died, and his son was substituted as his successor. The son then asserted a defense under Code of Civil Procedure section 377.42, which allows for all damages against a successor that would have been available against a predecessor *except* for punitive or exemplary damages. The son argued that Probate Code section 859 was a form of punitive damages and thus unavailable against him. (*Hill*, at pp. 1283-1284.)

The *Hill* court rejected that argument for several persuasive reasons, concluding that statutory penalties are distinct from punitive damages. Amidst its analysis, the court highlighted some differences between Civil Code section 3294 (punitive damages) and Probate Code section 859 (*Hill*, *supra*, 244 Cal.App.4th at pp. 1286-1287), including the following: "As quoted above, Civil Code section 3294 always requires proof of some form of aggravated misconduct. As also quoted above, Probate Code section 859 provides for double damages if a person has in 'bad faith' done certain things and also if the wrongdoer has 'taken, concealed, or disposed of the property by the use of undue influence in bad faith *or through the commission of elder or dependent adult financial abuse,* as defined in Section 15610.30 of the Welfare and Institutions

15

Code . . . .' (Italics added.) So, the last alternative of section 859 allows for double damages without any requirement that petitioners show any aggravated misconduct—only financial elder abuse." (*Id*. at p. 1287.)

To an extent, we agree with this comment. Probate Code section 859 does not require a finding of bad faith in analyzing financial elder abuse in general. And as we have already pointed out, the first two branches of financial elder abuse (Welf. & Inst. Code, § 15610.30, subds. (a)(1), (2)) require a finding of "wrongful use or intent to defraud," which is tantamount to bad faith. However, *Hill* was not an undue influence case, and thus the court did not have occasion to analyze how Probate Code section 859's requirement of undue influence *with* bad faith would impact the analysis of an undue influence theory of financial elder abuse *without* bad faith. Cases are not authority for propositions not considered. (*State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 614.) Our holding applies only to undue influence cases.

The second case is *Kerley v. Weber* (2018) 27 Cal.App.5th 1187 (*Kerley*). In *Kerley* the defendant (Weber) had been convicted of theft from an elder under Penal Code section 368, subdivision (d), which prohibits "theft, embezzlement, forgery, or fraud" against an elder. (See *Kerley*, at p. 1191.) In the criminal action, Weber had stipulated that she owed $700,000 in restitution. (*Id.* at p. 1192.) Meanwhile, a probate action had been pending in which the victim's conservator (and later administrator of the victim's estate) sought double damages under Probate Code section 859. (*Kerley*, at p. 1193.) Prior to the trial in the probate action, the court ruled that Weber's stipulation in the criminal action resolved all outstanding issues in the probate case. Weber's conviction established the elements of elder financial abuse, which she was collaterally estopped from disputing in the probate action, and she had stipulated to the amount wrongfully taken. (*Ibid.*) Accordingly, the court doubled that amount and entered a judgment of $1.4 million. (*Ibid.*)

16

Weber appealed, contending the criminal action did not establish bad faith, a required finding under Probate Code section 859. The court rejected that argument, concluding bad faith is not a required finding where double damages are based on financial elder abuse. (*Kerley*, *supra*, 27 Cal.App.5th at p. 1197.) The court reasoned, "Thus, section 859 uses three different clauses separated by the conjunction 'or' to describe three different categories of conduct that can support double damages: (1) taking property in bad faith; (2) taking property by the use of undue influence in bad faith; and (3) taking property through elder or dependent adult abuse as defined in Welfare and Institutions Code section 15610.30. Because the third clause applied here, no separate finding of bad faith was necessary." (*Id.* at pp. 1197-1198 [citing *Hill*, *supra*, 244 Cal.App.4th 1281].)

As was the case with *Hill,* we generally agree with both the result and the reasoning in *Kerley*. However, once again, *Kerley* was not an undue influence case. Instead, the court found the criminal conviction had established the elements of Welfare and Institutions Code section 15610.30, subdivision (a)(1), which prohibits taking property "'for a wrongful use or with intent to defraud.'" (*Kerley*, *supra*, 27 Cal.App.5th at p. 1194.) No additional finding of bad faith is required in that context. Accordingly, as in *Hill*, the court had no occasion to consider what findings would be required to establish double damages for financial elder abuse based on a theory of undue influence.[5]

---

[5] On the topic of elder abuse, Debra argues that Elizabeth did not have standing to bring a claim for elder abuse under Welfare and Institutions Code section 15657.3, subdivision (d)(1), which is part of the Elder Abuse and Dependent Adult Civil Protection Act (the Elder Abuse Act). In her reply brief, Elizabeth claims she did have standing. We find the whole discussion puzzling because, while Elizabeth pleaded a claim under the Elder Abuse Act, the trial court never ruled on it. Rather, the claim the court ruled on arose under Probate Code section 850. The elder abuse claim had relevance only as to the claimed foundation for a double damage remedy under Probate Code section 859. Accordingly, we need not address whether Elizabeth would have standing to bring a claim under the Elder Abuse Act.

17

*Substantial Evidence Supports the Finding the 2008 Amendment Was Free of Debra's Undue Influence*

Elizabeth's next argues the court erred in failing to apply a presumption of undue influence to the 2008 amendment, which, had the court applied it, would have gone unrebutted by Debra.

"In property-related transactions between spouses, Family Code section 721, subdivision (b) 'imposes a duty of the highest good faith and fair dealing on each spouse . . . .' This duty stems from the 'general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other,' prohibiting each spouse from taking 'any unfair advantage of the other.' [Citation.] Thus, '"[i]f one spouse secures an advantage from the transaction, a statutory presumption arises under section 721 that the advantaged spouse exercised undue influence and the transaction will be set aside."' [Citation.] An advantage results to one spouse when that spouse gains or when the other spouse is hurt by the transaction." (*Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1353.) "The presumption is rebuttable; the spouse advantaged by the transaction must establish that the disadvantaged spouse acted freely and voluntarily, with "'""full knowledge of all the facts, and with a complete understanding of the effect of" the transaction.'"'" (*Ibid.*)

The parties have argued at some length over whether the transaction here qualified as the sort of inter-spousal transaction that could trigger a presumption of undue influence. In our view, however, that issue has no effect on the outcome. Assuming the presumption is triggered, it is a presumption affecting the burden of proof (Evid. Code, § 605), and "'[t]he question "whether the spouse gaining an advantage has overcome the presumption of undue influence is a question for the trier of fact, whose decision will not be reversed on appeal if supported by substantial evidence."'" (*In re Marriage of Lund* (2009) 174 Cal.App.4th 40, 45.) So if the court's ruling (that the 2008 amendment was

18

free of undue influence) is supported by substantial evidence, we need not analyze whether the presumption was triggered by the trust amendment.

Substantial evidence does indeed support the court's finding. In July 2008, Robert's neurologist and long-time friend reported that Robert "was alert and oriented" and his "[m]emory and abstracting ability were normal." In April 2009 the same neurologist noted Robert's history and examination suggested only "mild cognitive impairment." The same neurologist opined in November 2011, three years later, that Robert was still "capable of taking care of his own affairs including financial decisions." Around the same time, another doctor offered a similar opinion. Even Elizabeth's expert noted that in February of 2012, "compared to earlier records . . . from at least 2009 and 2008, that there was a significant decline in [Robert's] cognitive functioning," suggesting Robert's mental decline was far less pronounced at the time of the 2008 amendment.

Moreover, the evidence showed Robert made a reasoned decision in deciding upon the allocation of property reflected in the 2008 amendment. Robert's long-time friend, Judy Creighton, testified that on multiple occasions Robert discussed with her that he was upset about Elizabeth constantly asking for money. She testified about one visit in particular where, in her presence, Robert received a phone call from Elizabeth and answered it on speaker phone so she could hear. Elizabeth said to Robert, "Dad, we need to talk about the Balboa house without [Debra] and the attorney." Robert responded, "Liz, I have talked to you about this before. I told you, we are not speaking about it again. The house goes to [Debra]." Afterwards, Robert commented, "This is what I put up with all the time on a daily basis." Robert explained to Creighton that he had decided to give the residence to Debra and instead provide a sizeable life insurance policy for Elizabeth. In fact, Elizabeth ultimately received $1.3 million from that policy.

19

Finally, there was evidence that Debra did not play any role in the 2008 amendment. Debra testified that she never discussed the estate plan with Robert, and the disposition of the residence in particular, prior to 2008.

Collectively, this evidence was sufficient to support a finding that the 2008 amendment was a rational decision made by Robert, uninfluenced by Debra, at a time when his mental health was still adequate for the task. Accordingly, the court's finding that Debra did not exert undue influence in 2008 was supported by substantial evidence.

*The Court Did Not Err in Invalidating the Entire 2012 Amendment and Related Deed*

Elizabeth's final contention is that the court erred in voiding the entire 2012 amendment, as opposed solely to those portions tainted by undue influence (i.e., the $2 million gift and the separate transfer of the residence). "It is the general rule that if the whole will is the result of the presence of undue influence, the will is totally invalidated; but if only a part of the will was thus procured, that part may be rejected as void, but the remainder, which is the outcome of the testator's free will, is valid if it is not inconsistent with and can be separated from the part which is invalid." (*Estate of Molera* (1972) 23 Cal.App.3d 993, 1001; see *Burkett v. Capovilla* (2003) 112 Cal.App.4th 1444, 1449 ["The California Probate Code applies the same general rules of interpretation to 'a will, trust, deed and any other instrument'"].) In general, a court's finding of undue influence is reviewed for substantial evidence (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 31), and since the question here is the extent to which undue influence affected the 2012 amendment, the same standard applies.

Here is what is at stake on this issue. First, under the 2012 amendment, after Debra dies 90 percent of the residue of the estate is granted to Elizabeth free of trust. The 2008 amendment granted Elizabeth a life estate in the income of the trust following the death of Debra, but upon Elizabeth's death the residue was to be given to Shriner's Hospital. Second, the 2012 amendment does not specifically address the residence. The

20

court addressed this omission by effectively setting aside the 2012 deed to Debra and ordering the property returned to the Levin Trust. Under the 2008 amendment, the residence goes to Debra free and clear of trust upon Robert's death. Thus, setting aside the 2012 amendment and deed results in Debra ultimately receiving the residence free of trust and Elizabeth enjoying a life estate in the trust income following Debra's death instead of 90 percent of the residue free of the trust.

We conclude that substantial evidence supports the court's implied finding that undue influence tainted the entire 2012 amendment. The history of Robert's estate planning reveals a calculated attempt to balance the disposition of his assets between his wife and his daughter. In attempting to strike that balance, the residence always played a significant role. When Robert decided to leave the residence to Debra in 2008, he offset that bequest with a life insurance policy in favor of Elizabeth. And for many years Robert evidenced an intent to safeguard the trust assets by granting a lifetime of support from the trust income to Elizabeth, but not grating her the trust assets free and clear of the trust. Were the 2012 amendment to apply without the provisions benefiting Debra, the balance that Robert always carefully struck would be upended. Ultimately, a court's role in interpreting a trust is to effect the intention of the trustor. (*Citizens Business Bank v. Carrano* (2010) 189 Cal.App.4th 1200, 1205.) In light of Robert's estate planning history, the trial court drew a reasonable inference that the 2012 amendment, without the provisions benefiting Debra, would not represent Robert's intended disposition. Accordingly, there was no error in voiding the entire 2012 amendment.

21

DISPOSITION

The judgment is affirmed.  Debra shall recover her costs incurred on appeal.


IKOLA, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.